**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TIMOTHY S. VERNOR,
          *Plaintiff-Appellee,*

v.

AUTODESK, INC.,
          *Defendant-Appellant.*

No. 09-35969

D.C. No.
2:07-cv-01189-RAJ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Richard A. Jones, District Judge, Presiding

Argued and Submitted
June 7, 2010—Seattle, Washington

Filed September 10, 2010

Before: William C. Canby, Jr., Consuelo M. Callahan and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Callahan

13861

## COUNSEL

Jerome B. Falk (argued), Clara J. Shin, and Blake J. Lawit of Howard Rice Nemerovski Canady Falk & Rabkin P.C., and Michael A. Jacobs and George C. Harris of Morrison & Foerster LLP, for defendant-appellant Autodesk, Inc.

Gregory A. Beck (argued) and Deepak Gupta of the Public Citizen Litigation Group, for plaintiff-appellee Timothy S. Vernor.

Randi W. Singer, Mark J. Fiore, and Lisa R. Eskow of Weil, Gotshal & Manges LLP, for amicus curiae eBay Inc.

Fred von Lohmann of the Electronic Frontier Foundation and Sherwin Siy and John Bergmayer of Public Knowledge, for amicus curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, Consumer Federation of America, Electronic Frontier Foundation, Public Knowledge, and U.S. PIRG.

Scott E. Bain, Keith Kupferschmid, and Mark Bohannon, for amicus curiae Software & Information Industry Association.

Robert H. Rotstein, Patricia H. Benson, and J. Matthew Williams of Mitchell Silberberg & Knupp LLP, for amicus curiae Motion Picture Association of America, Inc.

## OPINION

CALLAHAN, Circuit Judge:

Timothy Vernor purchased several used copies of Autodesk, Inc.'s AutoCAD Release 14 software ("Release 14") from one of Autodesk's direct customers, and he resold the Release 14 copies on eBay. Vernor brought this declaratory judgment action against Autodesk to establish that these resales did not infringe Autodesk's copyright. The district court issued the requested declaratory judgment, holding that Vernor's sales were lawful because of two of the Copyright Act's affirmative defenses that apply to owners of copies of copyrighted works, the first sale doctrine and the essential step defense.

Autodesk distributes Release 14 pursuant to a limited license agreement in which it reserves title to the software copies and imposes significant use and transfer restrictions on its customers. We determine that Autodesk's direct customers are licensees of their copies of the software rather than owners, which has two ramifications. Because Vernor did not purchase the Release 14 copies from an owner, he may not invoke the first sale doctrine, and he also may not assert an essential step defense on behalf of his customers. For these reasons, we vacate the district court's grant of summary judgment to Vernor and remand for further proceedings.

**I.**

### A.   Autodesk's Release 14 software and licensing practices

The material facts are not in dispute. Autodesk makes computer-aided design software used by architects, engineers, and manufacturers. It has more than nine million customers. It first released its AutoCAD software in 1982. It holds registered copyrights in all versions of the software including the discontinued Release 14 version, which is at issue in this case. It provided Release 14 to customers on CD-ROMs.

Since at least 1986, Autodesk has offered AutoCAD to customers pursuant to an accompanying software license agreement ("SLA"), which customers must accept before installing the software. A customer who does not accept the SLA can return the software for a full refund. Autodesk offers SLAs with different terms for commercial, educational institution, and student users. The commercial license, which is the most expensive, imposes the fewest restrictions on users and allows them software upgrades at discounted prices.

The SLA for Release 14 first recites that Autodesk retains title to all copies. Second, it states that the customer has a nonexclusive and nontransferable license to use Release 14. Third, it imposes transfer restrictions, prohibiting customers from renting, leasing, or transferring the software without Autodesk's prior consent and from electronically or physically transferring the software out of the Western Hemisphere. Fourth, it imposes significant use restrictions:

> YOU MAY NOT: (1) modify, translate, reverse-engineer, decompile, or disassemble the Software . . . (3) remove any proprietary notices, labels, or marks from the Software or Documentation; (4) use . . . the Software outside of the Western Hemisphere; (5) utilize any computer software or hardware

designed to defeat any hardware copy-protection device, should the software you have licensed be equipped with such protection; or (6) use the Software for commercial or other revenue-generating purposes if the Software has been licensed or labeled for educational use only.

Fifth, the SLA provides for license termination if the user copies the software without authorization or does not comply with the SLA's restrictions. Finally, the SLA provides that if the software is an upgrade of a previous version:

> [Y]ou must destroy the software previously licensed to you, including any copies resident on your hard disk drive . . . within sixty (60) days of the purchase of the license to use the upgrade or update . . . . Autodesk reserves the right to require you to show satisfactory proof that previous copies of the software have been destroyed.

Autodesk takes measures to enforce these license requirements. It assigns a serial number to each copy of AutoCAD and tracks registered licensees. It requires customers to input "activation codes" within one month after installation to continue using the software.[1] The customer obtains the code by providing the product's serial number to Autodesk. Autodesk issues the activation code after confirming that the serial number is authentic, the copy is not registered to a different customer, and the product has not been upgraded. Once a customer has an activation code, he or she may use it to activate the software on additional computers without notifying Autodesk.

---

[1]Prior to using activation codes, Autodesk required users to return one disc of an earlier version of the software to upgrade to a later version. Autodesk has abandoned this return policy, deeming it slow and unworkable.

**B.   Autodesk's provision of Release 14 software to CTA**

In March 1999, Autodesk reached a settlement agreement with its customer Cardwell/Thomas & Associates, Inc. ("CTA"), which Autodesk had accused of unauthorized use of its software. As part of the settlement, Autodesk licensed ten copies of Release 14 to CTA. CTA agreed to the SLA, which appeared (1) on each Release 14 package that Autodesk provided to CTA; (2) in the settlement agreement; and (3) on-screen, while the software is being installed.

CTA later upgraded to the newer, fifteenth version of the AutoCAD program, AutoCAD 2000. It paid $495 per upgrade license, compared to $3,750 for each new license. The SLA for AutoCAD 2000, like the SLA for Release 14, required destruction of copies of previous versions of the software, with proof to be furnished to Autodesk on request. However, rather than destroying its Release 14 copies, CTA sold them to Vernor at an office sale with the handwritten activation codes necessary to use the software.[2]

**C.   Vernor's eBay business and sales of Release 14**

Vernor has sold more than 10,000 items on eBay. In May 2005, he purchased an authentic used copy of Release 14 at a garage sale from an unspecified seller. He never agreed to the SLA's terms, opened a sealed software packet, or installed the Release 14 software. Though he was aware of the SLA's existence, he believed that he was not bound by its terms. He posted the software copy for sale on eBay.

Autodesk filed a Digital Millennium Copyright Act ("DMCA") take-down notice with eBay claiming that Vernor's sale infringed its copyright, and eBay terminated Ver-

---

[2]Autodesk brought suit in federal district court against CTA for these sales. The parties stipulated to entry of a permanent injunction against CTA from directly or contributorily infringing Autodesk's copyrights.

nor's auction.[3] Autodesk advised Vernor that it conveyed its software copies pursuant to non-transferable licenses, and resale of its software was copyright infringement. Vernor filed a DMCA counter-notice with eBay contesting the validity of Autodesk's copyright claim.[4] Autodesk did not respond to the counter-notice. eBay reinstated the auction, and Vernor sold the software to another eBay user.

In April 2007, Vernor purchased four authentic used copies of Release 14 at CTA's office sale. The authorization codes were handwritten on the outside of the box. He listed the four copies on eBay sequentially, representing, "This software is not currently installed on any computer."[5] On each of the first three occasions, the same DMCA process ensued. Autodesk filed a DMCA take-down notice with eBay, and eBay removed Vernor's auction. Vernor submitted a counter-notice to which Autodesk did not respond, and eBay reinstated the auction.

When Vernor listed his fourth, final copy of Release 14,

---

[3]The DMCA provides that a service provider is not liable for infringing user-posted material on its service if, *inter alia*, it responds expeditiously to remove or disable access to the material upon receipt of a take-down notice claiming infringement. 17 U.S.C. § 512(c)(1)(C).

[4]The DMCA also provides that a user whose material has been removed or disabled may provide a "counter-notification" to the service provider, including a sworn statement that the user has a good-faith belief that the material was mistakenly removed or disabled. 17 U.S.C. § 512(g)(3)(C). After receiving a counter-notification, the service provider must do the following to retain its liability exemption. It must promptly (1) provide the person who filed the original take-down notice with a copy of the counter-notification and (2) advise that it will replace the removed material or cease disabling access to it in ten business days. 17 U.S.C. § 512(g)(2)(B). It must also timely replace the removed material or cease disabling access to it, unless the person who provided the take-down notice gives notice that he or she has filed a court action to restrain the user's infringement. 17 U.S.C. § 512(g)(2)(C).

[5]Vernor acknowledged at his deposition that he did not know whether this was true.

Autodesk again filed a DMCA take-down notice with eBay. This time, eBay suspended Vernor's account because of Autodesk's repeated charges of infringement. Vernor also wrote to Autodesk, claiming that he was entitled to sell his Release 14 copies pursuant to the first sale doctrine, because he never installed the software or agreed to the SLA. In response, Autodesk's counsel directed Vernor to stop selling the software. Vernor filed a final counter-notice with eBay. When Autodesk again did not respond to Vernor's counter-notice, eBay reinstated Vernor's account. At that point, Vernor's eBay account had been suspended for one month, during which he was unable to earn income on eBay.

Vernor currently has two additional copies of Release 14 that he wishes to sell on eBay. Although the record is not clear, it appears that Vernor sold two of the software packages that he purchased from CTA, for roughly $600 each, but did not sell the final two to avoid risking further suspension of his eBay account.

## II.

In August 2007, Vernor brought a declaratory action against Autodesk to establish that his resales of used Release 14 software are protected by the first sale doctrine and do not infringe Autodesk's copyright. He also sought damages and injunctive relief. On January 15, 2008, Autodesk moved to dismiss Vernor's complaint, or in the alternative, for summary judgment. The district court denied the motion, holding that Vernor's sales were non-infringing under the first sale doctrine and the essential step defense. *See Vernor v. Autodesk, Inc.*, 555 F. Supp. 2d 1164, 1170-71, 1175 (W.D. Wash. 2008).

Following discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment to Vernor as to copyright infringement in an unpublished decision. However, the district court declined to resolve

Vernor's affirmative defense that Autodesk had misused its copyright, reasoning that a misuse defense would not benefit Vernor since he had prevailed on copyright infringement. In October 2009, the district court entered judgment for Vernor, and Autodesk timely appealed.

## III.

[1] Copyright is a federal law protection provided to the authors of "original works of authorship," including software programs. 17 U.S.C. §§ 101-103. The Copyright Act confers several exclusive rights on copyright owners, including the exclusive rights to reproduce their works and to distribute their works by sale or rental. *Id*. § 106(1), (3). The exclusive distribution right is limited by the **first sale doctrine**, an affirmative defense to copyright infringement that allows owners of copies of copyrighted works to resell those copies. The exclusive reproduction right is limited within the software context by the **essential step defense**, another affirmative defense to copyright infringement that is discussed further *infra*. Both of these affirmative defenses are unavailable to those who are only licensed to use their copies of copyrighted works.

This case requires us to decide whether Autodesk sold Release 14 copies to its customers or licensed the copies to its customers. If CTA owned its copies of Release 14, then both its sales to Vernor and Vernor's subsequent sales were non-infringing under the first sale doctrine.[6] However, if Autodesk only licensed CTA to use copies of Release 14, then CTA's and Vernor's sales of those copies are not protected by the

---

[6]If Autodesk's transfer of Release 14 copies to CTA was a first sale, then CTA's resale of the software in violation of the SLA's terms would be a breach of contract, but would not result in copyright liability. *See United States v. Wise*, 550 F.2d 1180, 1187 (9th Cir. 1977) ("[T]he exclusive right to vend the transferred copy rests with the vendee, who is not restricted by statute from further transfers of that copy, even though in breach of an agreement restricting its sale.").

first sale doctrine and would therefore infringe Autodesk's exclusive distribution right.

## A.   The first sale doctrine

The Supreme Court articulated the first sale doctrine in 1908, holding that a copyright owner's exclusive distribution right is exhausted after the owner's first sale of a particular copy of the copyrighted work. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350-51 (1908). In *Bobbs-Merrill*, the plaintiff-copyright owner sold its book with a printed notice announcing that any retailer who sold the book for less than one dollar was responsible for copyright infringement. *Id.* at 341. Plaintiff sought injunctive relief against defendants-booksellers who failed to comply with the price restriction. *Id.* at 341-42. The Supreme Court rejected the plaintiff's claim, holding that its exclusive distribution right applied only to first sales of copies of the work. *Id.* at 350-51. The distribution right did not permit plaintiff to dictate that subsequent sales of the work below a particular price were infringing. *Id.* The Court noted that its decision solely applied to the rights of a copyright owner that distributed its work without a license agreement. *Id.* at 350 ("There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book.").

[2] Congress codified the first sale doctrine the following year. *See* 17 U.S.C. § 41 (1909). In its current form, it allows the "owner of a particular copy" of a copyrighted work to sell or dispose of his copy without the copyright owner's authorization.[7] *Id.* § 109(a) (enacted 1976). The first sale doctrine does not apply to a person who possesses a copy of the copyrighted work without owning it, such as a licensee. *See id.* § 109(d);

---

[7]The parties dispute who bears the burden to prove the first sale or the absence thereof in a civil case, a question we have not yet resolved. Since the facts in this case are undisputed, including the chain of software transfers, we need not decide the issue.

*cf. Quality King Distribs., Inc. v. L'Anza Research Int'l Inc.*, 523 U.S. 135, 146-47 (1998) ("[T]he first sale doctrine would not provide a defense to . . . any non-owner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful.").

## B.   Owners vs. licensees

We turn to our precedents governing whether a transferee of a copy of a copyrighted work is an owner or licensee of that copy. We then apply those precedents to CTA's and Vernor's possession of Release 14 copies.

### 1.   *United States v. Wise*, 550 F.2d 1180 (9th Cir. 1977)

In *Wise*, a criminal copyright infringement case, we considered whether copyright owners who transferred copies of their motion pictures pursuant to written distribution agreements had executed first sales. *Id*. at 1187. The defendant was found guilty of copyright infringement based on his for-profit sales of motion picture prints. *See id*. at 1183. The copyright owners distributed their films to third parties pursuant to written agreements that restricted their use and transfer. *Id*. at 1183-84. On appeal, the defendant argued that the government failed to prove the absence of a first sale for each film.[8] If the copyright owners' initial transfers of the films were first sales, then the defendant's resales were protected by the first sale doctrine and thus were not copyright infringement.

To determine whether a first sale occurred, we considered multiple factors pertaining to each film distribution agreement. Specifically, we considered whether the agreement (a) was labeled a license, (b) provided that the copyright owner retained title to the prints, (c) required the return or destruc-

---

[8]In *Wise*, we construed former 17 U.S.C. § 27, since *replaced by* 17 U.S.C. § 109(a), the current codification of the first sale doctrine. The provisions are materially similar.

tion of the prints, (d) forbade duplication of prints, or (e) required the transferee to maintain possession of the prints for the agreement's duration. *Id.* at 1190-92. Our use of these several considerations, none dispositive, may be seen in our treatment of each film print.

For example, we reversed the defendant's conviction with respect to *Camelot. Id.* at 1194. It was unclear whether the *Camelot* print sold by the defendant had been subject to a first sale. Copyright owner Warner Brothers distributed *Camelot* prints pursuant to multiple agreements, and the government did not prove the absence of a first sale with respect to each agreement. *Id.* at 1191-92, 1194. We noted that, in one agreement, Warner Brothers had retained title to the prints, required possessor National Broadcasting Company ("NBC") to return the prints if the parties could select a mutual agreeable price,[9] and if not, required NBC's certification that the prints were destroyed. *Id.* at 1191. We held that these factors created a license rather than a first sale. *Id.*

We further noted, however, that Warner Brothers had also furnished another *Camelot* print to actress Vanessa Redgrave. *Id.* at 1192. The print was provided to Redgrave at cost, and her use of the print was subject to several restrictions. She had to retain possession of the print and was not allowed to sell, license, reproduce, or publicly exhibit the print. *Id.* She had no obligation to return the print to Warner Brothers. *Id.* We concluded, "While the provision for payment for the cost of the film, standing alone, does not establish a sale, when taken with the rest of the language of the agreement, it reveals a transaction strongly resembling a sale with restrictions on the use of the print." *Id.* There was no evidence of the print's whereabouts, and we held that "[i]n the absence of such

---

[9]Although the *Wise* defendant contended that this repurchase provision created a first sale, we held that it merely allowed Warner Brothers to compensate NBC for its out-of-pocket cost in producing additional prints. *Id.*

proof," the government failed to prove the absence of a first sale with respect to this Redgrave print. *Id.* at 1191-92. Since it was unclear which copy the defendant had obtained and resold, his conviction for sale of *Camelot* had to be reversed. *Id.*

Thus, under *Wise*, where a transferee receives a particular copy of a copyrighted work pursuant to a written agreement, we consider all of the provisions of the agreement to determine whether the transferee became an owner of the copy or received a license. We may consider (1) whether the agreement was labeled a license and (2) whether the copyright owner retained title to the copy, required its return or destruction, forbade its duplication, or required the transferee to maintain possession of the copy for the agreement's duration. *Id.* at 1190-92. We did not find any one factor dispositive in *Wise*: we did not hold that the copyright owner's retention of title itself established the absence of a first sale or that a transferee's right to indefinite possession itself established a first sale.[10]

2. *The "*MAI *trio" of cases*

Over fifteen years after *Wise*, we again considered the distinction between owners and licensees of copies of copyrighted works in three software copyright cases, the "*MAI* trio". *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330 (9th Cir. 1995); *Wall Data, Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769 (9th Cir. 2006). In the *MAI* trio, we considered which software purchasers were

---

[10]*Cf. Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 103 (9th Cir. 1960) (holding in non-first sale doctrine case that the transferee of a movie print was a licensee because the parties designated their agreement as a perpetual license, even though their agreement provided for a one-time lump sum payment and imposed no requirement that the transferee would return the outstanding prints and negatives).

owners of copies of copyrighted works for purposes of a second affirmative defense to infringement, the essential step defense.

**[3]** The enforcement of copyright owners' exclusive right to reproduce their work under the Copyright Act, 17 U.S.C. § 106(1), has posed special challenges in the software context. In order to use a software program, a user's computer will automatically copy the software into the computer's random access memory ("RAM"), which is a form of computer data storage. *See MAI*, 991 F.2d at 513. Congress enacted the **essential step defense** to codify that a software user who is the "owner of a copy" of a copyrighted software program does not infringe by making a copy of the computer program, if the new copy is "created as an essential step in the utilization of the computer program in conjunction with a machine and . . . is used in no other manner." 17 U.S.C. § 117(a)(1).

The Copyright Act provides that an "owner of a copy" of copyrighted software may claim the essential step defense, and the "owner of a particular copy" of copyrighted software may claim the first sale doctrine. 17 U.S.C. §§ 109(a), 117(a)(1). The *MAI* trio construed the phrase "owner of a copy" for essential step defense purposes. Neither Vernor nor Autodesk contends that the first sale doctrine's inclusion of the word "particular" alters the phrase's meaning, and we "presume that words used more than once in the same statute have the same meaning throughout." *Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.)*, 252 F.3d 1039, 1051 (9th Cir. 2002). Accordingly, we consider the *MAI* trio's construction of "owner of a copy" controlling in our analysis of whether CTA and Vernor became "owner[s] of a particular copy" of Release 14 software.

In *MAI* and *Triad*, the defendants maintained computers that ran the plaintiffs' operating system software. *MAI*, 991 F.2d at 513; *Triad*, 64 F.3d at 1333. When the defendants ran the computers, the computers automatically loaded plaintiffs'

software into RAM. *MAI*, 991 F.2d at 517-18; *Triad*, 64 F.3d at 1333, 1335-36. The plaintiffs in both cases sold their software pursuant to restrictive license agreements, and we held that their customers were licensees who were therefore not entitled to claim the essential step defense. We found that the defendants infringed plaintiffs' software copyrights by their unauthorized loading of copyrighted software into RAM. *MAI*, 991 F.2d at 517-18 & n.5; *Triad*, 64 F.3d at 1333, 1335-36. In *Triad*, the plaintiff had earlier sold software outright to some customers. 64 F.3d at 1333 n.2. We noted that these customers were owners who were entitled to the essential step defense, and the defendant did not infringe by making RAM copies in servicing their computers. *Id*.

In *Wall Data*, plaintiff sold 3,663 software licenses to the defendant. *Wall Data*, 447 F.3d at 773. The licenses (1) were non-exclusive; (2) permitted use of the software on a single computer; and (3) permitted transfer of the software once per month, if the software was removed from the original computer. *Id*. at 775 n.5, 781. The defendant installed the software onto 6,007 computers via hard drive imaging, which saved it from installing the software manually on each computer. It made an unverified claim that only 3,663 users could simultaneously access the software. *Id*. at 776.

[4] The plaintiff sued for copyright infringement, contending that the defendant violated the license by "over-installing" the software. *Id*. at 775. The defendant raised an essential step defense, contending that its hard drive imaging was a necessary step of installation. *Id*. at 776. On appeal, we held that the district court did not abuse its discretion in denying the defendant's request for a jury instruction on the essential step defense. *Id*. at 784. Citing *MAI*, we held that the essential step defense does not apply where the copyright owner grants the user a license and significantly restricts the user's ability to transfer the software. *Id*. at 784-85. Since the plaintiff's license imposed "significant restrictions" on the defendant's

software rights, the defendant was a licensee and was not entitled to the essential step defense. *Id.* at 785.

In *Wall Data*, we acknowledged that *MAI* had been criticized in a Federal Circuit decision, but declined to revisit its holding, noting that the facts of *Wall Data* led to the conclusion that any error in the district court's failure to instruct was harmless. Even if the defendant owned its copies of the software, its installation of the software on a number of computers in excess of its license was not an essential step in the software's use. *Id.* at 786 n.9 (citing Nimmer on Copyright § 8.08[B][1][c] at 8-136; *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1360 (Fed. Cir. 1999) (criticizing *MAI*)).

We read *Wise* and the *MAI* trio to prescribe three considerations that we may use to determine whether a software user is a licensee, rather than an owner of a copy. First, we consider whether the copyright owner specifies that a user is granted a license. Second, we consider whether the copyright owner significantly restricts the user's ability to transfer the software. Finally, we consider whether the copyright owner imposes notable use restrictions.[11] Our holding reconciles the *MAI* trio and *Wise*, even though the *MAI* trio did not cite *Wise. See Cisneros-Perez v. Gonzales*, 451 F.3d 1053, 1058 (9th Cir. 2006) ("[W]e are required to reconcile prior precedents if we can do so.")

---

[11]Although use restrictions were not dispositive in the *MAI* trio, we considered them in each case. *See MAI*, 991 F.2d at 517 n.3 (license limited user to making one working and one backup copy of the software, and forbade examination, disclosure, copying, modification, adaptation, and visual display of the software); *Triad*, 64 F.3d at 1333 (license prohibited software duplication and third-party use); *Wall Data*, 447 F.3d at 775 n.5 (license permitted software use on single computer, prohibited multi-computer and multi-user arrangements, and permitted transfer to another computer no more than once every thirty days).

In response to *MAI*, Congress amended § 117 to permit a *computer owner* to copy software for maintenance or repair purposes. *See* 17 U.S.C. § 117(c); *see also* H.R. Rep. No. 105-551, pt. 1, at 27 (1998). However, Congress did not disturb *MAI*'s holding that licensees are not entitled to the essential step defense.

## IV.

### A.   The district court's decision

The district court interpreted *Wise* to hold that a first sale occurs whenever the transferee is entitled to keep the copy of the work. Since Autodesk does not require its customers to return their copies of Release 14, the district court found that Autodesk had sold Release 14 to CTA. It reasoned that thus, CTA and Vernor were successive "owner[s] of a copy" of the software and were entitled to resell it under the first sale doctrine. The district court also found that Vernor's customers' copying of software during installation was protected by the essential step defense.

The district court acknowledged that were it to follow the *MAI* trio, it would conclude that Autodesk had licensed Release 14 copies to CTA, rather than sold them. However, it viewed *Wise* and the *MAI* trio as irreconcilable, and it followed *Wise* as the first-decided case. *See United States v. Rodriguez-Lara*, 421 F.3d 932, 943 (9th Cir. 2005).

### B.   Analysis

[5] We hold today that a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions.[12] Applying our holding to Autodesk's

---

[12]We review the district court's grant of summary judgment to Vernor de novo. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002).

SLA, we conclude that CTA was a licensee rather than an owner of copies of Release 14 and thus was not entitled to invoke the first sale doctrine or the essential step defense.

**[6]** Autodesk retained title to the software and imposed significant transfer restrictions: it stated that the license is nontransferable, the software could not be transferred or leased without Autodesk's written consent, and the software could not be transferred outside the Western Hemisphere. The SLA also imposed use restrictions against the use of the software outside the Western Hemisphere and against modifying, translating, or reverse-engineering the software, removing any proprietary marks from the software or documentation, or defeating any copy protection device. Furthermore, the SLA provided for termination of the license upon the licensee's unauthorized copying or failure to comply with other license restrictions. Thus, because Autodesk reserved title to Release 14 copies and imposed significant transfer and use restrictions, we conclude that its customers are licensees of their copies of Release 14 rather than owners.

**[7]** CTA was a licensee rather than an "owner of a particular copy" of Release 14, and it was not entitled to resell its Release 14 copies to Vernor under the first sale doctrine. 17 U.S.C. § 109(a). Therefore, Vernor did not receive title to the copies from CTA and accordingly could not pass ownership on to others. Both CTA's and Vernor's sales infringed Autodesk's exclusive right to distribute copies of its work. *Id.* § 106(3).

**[8]** Because Vernor was not an owner, his customers are also not owners of Release 14 copies. Therefore, when they install Release 14 on their computers, the copies of the software that they make during installation infringe Autodesk's exclusive reproduction right because they too are not entitled to the benefit of the essential step defense.[13] 17 U.S.C. §§ 106(1), 117(a)(1).

---

[13]It may seem intuitive that every lawful user of a copyrighted software program, whether they own their copies or are merely licensed to use

**[9]** Although unnecessary to our resolution of the case, we address the legislative history in order to address the arguments raised by the parties and amici. That legislative history supports our conclusion that licensees such as CTA are not entitled to claim the first sale doctrine. The House Report for § 109 underscores Congress' view that the first sale doctrine is available only to a person who has acquired a copy via an "outright sale". H.R. Rep. No. 94-1476, at 79 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693. The report also asserts that the first sale doctrine does not "apply to someone who merely possesses a copy or phonorecord without having acquired ownership of it." *Id.*

**[10]** Our conclusion that those who rightfully possess, but do not own, a copy of copyrighted software are not entitled to claim the essential step defense is also supported by the legislative history. Congress enacted § 117 following a report from the National Commission on New Technological Uses of Copyrighted Works ("CONTU") proposing Copyright Act amendments. *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1360 (Fed. Cir. 1999) (citing *Final Report of the National Commission on New Technological Uses of Copyrighted Works*, U.S. Dept. of Commerce, PB-282141, at 30 (July 31, 1978)). CONTU's proposed version of § 117 was identical to the version that Congress enacted with one exception. *Id.* CONTU's version provided, "[I]t is not an infringement for the rightful possessor of a copy of a computer program to make or authorize the making of another copy or adaptation of that program . . . ." *Id.* Without explanation, Congress substituted "owner" for "rightful possessor." *Id.* This modification suggests that more than rightful possession

them, should be entitled to an "essential step defense" that provides that they do not infringe simply by using a computer program that they lawfully acquired. However, the Copyright Act confers this defense only on owners of software copies. *See* 17 U.S.C. § 117. In contrast, a licensee's right to use the software, including the right to copy the software into RAM, is conferred by the terms of its license agreement.

is required for § 117 to apply — i.e., that Congress did not intend licensees subject to significant transfer and use restrictions to receive the benefit of the essential step defense.

## C.   Vernor's four counterarguments are not persuasive

### 1.   *The district court's decision concerning indefinite possession*

Vernor contends that the district court correctly concluded that (1) *Wise* is the controlling precedent and (2) under *Wise*, the key factor is whether transferees are entitled to indefinite possession of their copy of a copyrighted work. As explained *supra*, we disagree. In *Wise*, we utilized a multi-factor balancing test to distinguish between a first sale and a license of a copyrighted film print. *United States v. Wise*, 550 F.2d 1180, 1190-92 (9th Cir. 1977). We considered a transferee's ability to possess a print indefinitely as one factor in our analysis, but we did not treat it as dispositive. If we had, we would not have needed to consider other contractual provisions, such as retention of title, copying prohibitions, and lending restrictions. *Id*. Moreover, we held in *Wise* that two agreements were licenses rather than first sales, even though those agreements did not describe any provision requiring the transferee to return the prints to the copyright owners. *Id*. at 1192 (analyzing VIP agreements for *The Sting* and *Funny Girl*).[14]

---

[14]We also note that for some of the *Wise* films, there was a lack of evidence whether transferees who had the option to purchase copies of the prints had done so. Without evidence concerning these options, the government could not sustain its criminal burden of proof to demonstrate the absence of a first sale. *See, e.g.*, 550 F.2d at 1191-92 ("No evidence was adduced at trial as to whether [transferee] exercised its election [to purchase a copy of the print], or, if it did, whether it resold that print. In the absence of such proof, the Government has failed in its burden of proving the absence of first sale of the photoplay *Funny Girl*.") Here, in contrast, the undisputed evidence includes the SLA between Autodesk and CTA, which reflects the absence of a first sale. The SLA evidences both the parties' intent to create a license and CTA's acquiescence to substantive restrictions that distinguish the transfer from an outright first sale.

2. *Circuit split with the Federal and Second Circuits*

Vernor contends that reversing the district court will create a circuit split with the Federal and Second Circuits. *See DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999); *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2nd Cir. 2005). We disagree.

In *DSC*, the Federal Circuit considered the essential step defense in a case in which the plaintiff and defendant sold competing telephone systems hardware cards. 170 F.3d at 1358. Rather than develop its own software, the defendant used its hardware to download plaintiff's software into RAM upon installation. *Id*. The plaintiff argued that this constituted copyright infringement, and the defendant countered that the relevant customers owned plaintiff's software, entitling them to an essential step defense. *Id*. at 1359-60. The court rejected the defendant's essential step defense, holding that plaintiff licensed its customers' use of their copies of the software in the relevant license agreement's transfer and use restrictions. *Id*. at 1360-61. Although the Federal Circuit rejected *MAI*'s "characterization of all licensees as non-owners," it deemed *MAI* "instructive" and determined that the agreements there in issue were licenses. *Id*. at 1360. Although *DSC* is thus narrower than *MAI*, it does not conflict with our holding today that a software customer bound by a restrictive license agreement may be a licensee of a copy not entitled to the first sale doctrine or the essential step defense.

The Second Circuit's decision in *Krause* is distinguishable. In *Krause*, the plaintiff-copyright owner was a software developer who sued his former employer for making allegedly infringing modifications to his software program. *Krause*, 402 F.3d at 120-21. The Second Circuit considered the totality of the parties' agreement to determine that the defendant was entitled to an essential step defense. *Id*. at 124. In *Krause*, unlike here, the parties did not have a written license agreement, the defendant-employer had paid the plaintiff-employee

significant consideration to develop the programs for its sole benefit, and the plaintiff had agreed to allow the defendant to use the programs "forever," regardless of whether the parties' relationship terminated. *Id*. at 124-25. Thus, the Second Circuit found that the defendant-employer owned its copies of the work. *Id*. The facts and the analysis in *Krause* are not contrary to our determination that CTA is a licensee rather than an owner.

### 3.    *The Supreme Court's holding in Bobbs-Merrill*

Vernor contends that *Bobbs-Merrill* establishes his entitlement to a first sale defense. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908). However, *Bobbs-Merrill* stands only for the proposition that a copyright owner's exclusive distribution right does not allow it to control sales of copies of its work after the first sale. *Id*. at 350. Decided in 1908, *Bobbs-Merrill* did not and could not address the question of whether the right to use software is distinct from the ownership of copies of software. Moreover, the Supreme Court in *Bobbs-Merrill* made explicit that its decision did not address the use of restrictions to create a license. *Id*. ("There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book.")

### 4.    *Economic realities of the transaction*

Finally, Vernor contends that "economic realities" demonstrate that Autodesk makes "first sales" to its customers, because Autodesk allows its customers to possess their copies of the software indefinitely and does not require recurring license payments. We held *supra* that neither of these factors is dispositive. Vernor cites no first sale doctrine case in support of this proposition. Rather, he cites *In re DAK Indus.,* 66 F.3d 1091, 1095 (9th Cir. 1995), a case in which we interpreted the Bankruptcy Code to decide whether a particular transaction should be considered a pre-petition sale. We commented that "[w]hen applying the bankruptcy code to this

transaction, we must look through its form to the 'economic realities of the particular arrangement.' " *Id*. Nothing in *DAK* is contrary to our reconciliation of *Wise* and the *MAI* trio.

**V.**

Although our holding today is controlled by our precedent, we recognize the significant policy considerations raised by the parties and amici on both sides of this appeal.

Autodesk, the Software & Information Industry Association ("SIIA"), and the Motion Picture Association of America ("MPAA") have presented policy arguments that favor our result. For instance, Autodesk argues in favor of judicial enforcement of software license agreements that restrict transfers of copies of the work. Autodesk contends that this (1) allows for tiered pricing for different software markets, such as reduced pricing for students or educational institutions; (2) increases software companies' sales; (3) lowers prices for all consumers by spreading costs among a large number of purchasers; and (4) reduces the incidence of piracy by allowing copyright owners to bring infringement actions against unauthorized resellers. SIIA argues that a license can exist even where a customer (1) receives his copy of the work after making a single payment and (2) can indefinitely possess a software copy, because it is the software code and associated rights that are valuable rather than the inexpensive discs on which the code may be stored. Also, the MPAA argues that a customer's ability to possess a copyrighted work indefinitely should not compel a finding of a first sale, because there is often no practically feasible way for a consumer to return a copy to the copyright owner.

Vernor, eBay, and the American Library Association ("ALA") have presented policy arguments against our decision. Vernor contends that our decision (1) does not vindicate the law's aversion to restraints on alienation of personal property; (2) may force everyone purchasing copyrighted property

to trace the chain of title to ensure that a first sale occurred; and (3) ignores the economic realities of the relevant transactions, in which the copyright owner permanently released software copies into the stream of commerce without expectation of return in exchange for upfront payment of the full software price. eBay contends that a broad view of the first sale doctrine is necessary to facilitate the creation of secondary markets for copyrighted works, which contributes to the public good by (1) giving consumers additional opportunities to purchase and sell copyrighted works, often at below-retail prices; (2) allowing consumers to obtain copies of works after a copyright owner has ceased distribution; and (3) allowing the proliferation of businesses.

The ALA contends that the first sale doctrine facilitates the availability of copyrighted works after their commercial lifespan, by *inter alia* enabling the existence of libraries, used bookstores, and hand-to-hand exchanges of copyrighted materials. The ALA further contends that judicial enforcement of software license agreements, which are often contracts of adhesion, could eliminate the software resale market, require used computer sellers to delete legitimate software prior to sale, and increase prices for consumers by reducing price competition for software vendors. It contends that Autodesk's position (1) undermines 17 U.S.C. § 109(b)(2), which permits non-profit libraries to lend software for non-commercial purposes, and (2) would hamper efforts by non-profits to collect and preserve out-of-print software. The ALA fears that the software industry's licensing practices could be adopted by other copyright owners, including book publishers, record labels, and movie studios.

These are serious contentions on both sides, but they do not alter our conclusion that our precedent from *Wise* through the *MAI* trio requires the result we reach. Congress is free, of course, to modify the first sale doctrine and the essential step defense if it deems these or other policy considerations to require a different approach.

## VI.

The district court did not consider Vernor's claim that Autodesk misused its copyright. Copyright misuse is an equitable defense to copyright infringement which precludes the copyright holder's enforcement of its copyright during the misuse period. *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 n.9 (9th Cir. 1997). The district court reasoned that a misuse defense would not benefit Vernor since he prevailed on copyright infringement below. Since we reverse the district court's grant of summary judgment in Vernor's favor on copyright infringement, we remand for the district court to consider Vernor's copyright misuse defense in the first instance.

## VII.

**[11]** We vacate the district court's grant of summary judgment in Vernor's favor and remand. We hold that because CTA is a licensee, not an owner, the "sale" of its Release 14 copies to Vernor did not convey ownership. Vernor is accordingly not entitled to invoke the first sale doctrine or the essential step defense, on behalf of his customers. We remand for further proceedings consistent with this opinion, including consideration of Vernor's copyright misuse defense.

**VACATED AND REMANDED.**