**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UMG RECORDINGS, INC., a
Delaware corporation,
     *Plaintiff-Counter-Defendant-*
             *Appellant,*

        v.

TROY AUGUSTO, an individual
doing business as Roast Beast
Music Collectables doing business
as Roastbeastmusic,
     *Defendant-Counter-Claimant-*
             *Appellee.*

No. 08-55998

D.C. No.
2:07-cv-03106-
SJO-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted
June 7, 2010—Seattle, Washington

Filed January 4, 2011

Before: William C. Canby, Jr., Consuelo M. Callahan and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Canby

**COUNSEL**

Russell J. Frackman, Mitchell Silberberg & Knupp, LLP, Los Angeles, California, for the plaintiff, counter-defendant, appellant.

Joseph C. Gratz, Keker & Van Nest, LLP, San Francisco, California, for the defendant-counter-claimant-appellee.

Robert W. Clarida, Cowan, Liebowitz & Latman, P.C., New York, New York, Jason Schultz, Samuelson Law, Technology & Public Policy Clinic, Berkeley, California, for the amici curiae.

---

**OPINION**

CANBY, Circuit Judge:

UMG Recordings appeals the district court's grant of summary judgment in favor of defendant Troy Augusto on UMG's claim of copyright infringement in violation of § 501 of the Copyright Act, which entitles copyright owners to institute an action for infringement of the exclusive right to distribute copies of the copyrighted work. *See* 17 U.S.C. §§ 501(a), (b), 106(3) (2006). The copies in issue comprise eight specially-produced compact discs, each embodying a copyrighted sound recording. UMG, the copyright owner, used the discs solely for marketing purposes, sending them unsolicited to individuals such as music critics and radio disc jockeys. Although Augusto was not one of those individuals, he managed to obtained the discs from various sources. He later sold them at auction, an act which UMG contends infringed its exclusive right to distribute the discs.

Augusto asserts that UMG's initial distribution of the discs effected a transfer of ownership of the discs to the recipients,

rendering the discs subject to the "first sale" doctrine, which permits one who has acquired ownership of a copy to dispose of that copy without the permission of the copyright owner. *See id.* § 109(a). UMG argues that the statements on the discs and the circumstances of their distribution granted only a license to each recipient, not a transfer of ownership (or "sale") of the copy. Absent a sale, UMG remained the owner of the discs and, accordingly, the defense of the first sale doctrine would be out of Augusto's reach. We conclude that the mailing indeed did effect a sale of the discs to the recipients for purposes of the first sale doctrine, and we affirm the order of the district court.

## BACKGROUND AND PROCEDURAL HISTORY

The material facts of the case are undisputed. UMG is among the world's largest music companies. One of its core businesses is the creation, manufacture, and sale of recorded music, or phonorecords, the copyrights of which are owned by UMG.[1] These phonorecords generally take the form of compact discs ("CDs").

Like many music companies, UMG ships specially-produced promotional CDs to a large group of individuals ("recipients"), such as music critics and radio programmers, that it has selected. There is no prior agreement or request by the recipients to receive the CDs. UMG does not seek or receive payment for the CDs, the content and design of which often differs from that of their commercial counterparts. UMG ships the promotional CDs by means of the United States Postal Service and United Parcel Service. Relatively few of the recipients refuse delivery of the CDs or return them to UMG, and UMG destroys those that are returned.

---

[1]The Copyright Act defines phonorecords as "material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101 (2006).

Most of the promotional CDs in issue in this case bore a statement (the "promotional statement") similar to the following:

> This CD is the property of the record company and is licensed to the intended recipient for personal use only. Acceptance of this CD shall constitute an agreement to comply with the terms of the license. Resale or transfer of possession is not allowed and may be punishable under federal and state laws.

Some of the CDs bore a more succinct statement, such as "Promotional Use Only—Not for Sale."[2]

Augusto was not among the select group of individuals slated to receive the promotional CDs. He nevertheless managed to acquire numerous such CDs, many of which he sold through online auctions at eBay.com. Augusto regularly advertised the CDs as "rare . . . industry editions" and referred to them as "Promo CDs."

After several unsuccessful attempts at halting the auctions through eBay's dispute resolution program, UMG filed a complaint against Augusto in the United States District Court for the Central District of California, alleging that Augusto had infringed UMG's copyrights in eight promotional CDs for which it retained the "exclusive right to distribute." The district court granted summary judgment in favor of Augusto,

---

[2]Despite the fact that the two types of statements bear little resemblance to each other, the parties unaccountably agree that both types have the same meaning (although they dispute what that meaning is). Insofar as the parties' agreement purports to establish that the two statements have the same legal consequences, it does not bind us. *See Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law.").

and UMG appealed. We have jurisdiction of the appeal pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review *de novo* a grant of summary judgment. *See Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). We may affirm on any ground supported by the record. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009).

While it is an open question as to whether the plaintiff or defendant bears the burden of proving the applicability of the first sale defense, *see United States v. Wise*, 550 F.2d 1180, 1191-92 (9th Cir. 1977) (government bears the burden of proof in the criminal context), we need not reach the issue in this case, because we would reach the same conclusion regardless of which party were to bear the burden.

## DISCUSSION

**[1]** To establish a prima facie case of copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) violation by the alleged infringer of at least one of the exclusive rights granted to copyright owners by the Copyright Act (the "Act"). *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing 17 U.S.C. § 501(a)). Section 106 of the Act grants copyright owners, such as UMG, the exclusive right, among others, "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership." 17 U.S.C. § 106(3); *see id.* § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by section[ ] 106 . . . is an infringer of the copyright . . . ."). The district court held that UMG made out a prima facie case of copyright infringement: UMG established that it owned the copyright to the promotional CDs and Augusto sold the CDs without UMG's permission.

Although UMG, as the owner of the copyright, has exclusive rights in the promotional CDs, "[e]xemptions, compulsory licenses, and defenses found in the Copyright Act narrow [those] rights." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept.*, 447 F.3d 769, 777 (9th Cir. 2006) (citing 17 U.S.C. §§ 107-22). Augusto invokes the "first sale" doctrine embodied in § 109(a) of the Act. 17 U.S.C. § 109(a). He argues that the circumstances attending UMG's distribution of the discs effected a "sale" (transfer of ownership) of the discs to the original recipients and that, under the "first sale" doctrine, the recipients and subsequent owners of those particular copies were permitted to sell or otherwise dispose of those copies without authorization by the copyright holder.

In the alternative, Augusto argues that the original recipients were entitled to treat the CDs as gifts under the Unordered Merchandise Statute, enacted as part of the Postal Reorganization Act of 1970, and therefore had "the right to retain, use, discard, or dispose of [them] in any manner [they saw] fit," in this case, by selling those CDs to the thrift shops and second-hand stores where Augusto states he purchased them. *See* 39 U.S.C. § 3009(a), (b) (2006); *see also* Postal Reorganization Act of 1970, Pub. L. No. 91-375, 84 Stat. 719 (codified at 39 U.S.C. § 101).

UMG, on the other hand, contends that the promotional statement effected a license with the recipients and, because the recipients were not owners but licensees of the CDs, neither they nor Augusto were entitled to sell or otherwise transfer the CDs. *See Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 146-47 (1998) ("[B]ecause the protection afforded by § 109(a) is available only to the 'owner' of a lawfully made copy . . . , the first sale doctrine would not provide a defense to . . . any nonowner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful."); *Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978) ("[U]nless title to the copy

passes through a first sale by the copyright holder, subsequent sales do not confer good title.").

### The Distribution of the Promotional CDs Effected a Sale

The first sale doctrine provides that "the owner of a particular copy or phonorecord lawfully made under [the Act], or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a). Notwithstanding its distinctive name, the doctrine applies not only when a copy is first sold, but when a copy is given away or title is otherwise transferred without the accouterments of a sale. *See* 4 Patry on Copyright § 13:15; *see also United States v. Atherton*, 561 F.2d 747, 750 (9th Cir. 1977) ("The 'sale' embodied in the first sale concept is a term of art."). "[O]nce the copyright owner places a copyrighted item in the stream of commerce . . . , he has exhausted his exclusive statutory right to control its distribution." *Quality King*, 523 U.S. at 152. The seminal illustration of the principle is found in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 341 (1908), where a copyright owner unsuccessfully attempted to restrain the resale of a copyrighted book by including in it the following notice: "The price of this book at retail is $1 net. No dealer is licensed to sell it at a less price, and a sale at less price will be treated as an infringement of the copyright." *Id.* The Court noted that the statutory grant to a copyright owner of the "sole right of vending" the work did not continue after the first sale of a given copy. *Id.* at 349-50. "The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it." *Id.* at 350. The attempt to limit resale below a certain price was therefore held invalid. *Id.* at 351.

**[2]** The rule of *Bobbs-Merrill* remains in full force, enshrined as it is in § 109(a) of the Act: a copyright owner who transfers title in a particular copy to a purchaser or donee cannot prevent resale of that particular copy. We have recog-

nized, however, that not every transfer of possession of a copy transfers title. Particularly with regard to computer software, we have recognized that copyright owners may create licensing arrangements so that users acquire only a license to use the particular copy of software and do not acquire title that permits further transfer or sale of that copy without the permission of the copyright owner. Our most recent example of that rule is *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010). Others are *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept.*, 447 F.3d 769 (9th Cir. 2006); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330 (9th Cir. 1995); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993). All of these cases dealt with the question whether arrangements with consumers amounted to sales of copies, or succeeded in awarding only licenses. They recognized that the mere labeling of an arrangement as a license rather than a sale, although it was a factor to be considered, was not by itself dispositive of the issue. *See, e.g., Vernor*, 621 F.3d at 1109 (construing *United States v. Wise*, 550 F.2d 1180, 1190-92 (9th Cir. 1977)).

The same question is presented here. Did UMG succeed in creating a license in recipients of its promotional CDs, or did it convey title despite the restrictive labeling on the CDs? We conclude that, under all the circumstances of the CDs' distribution, the recipients were entitled to use or dispose of them in any manner they saw fit, and UMG did not enter a license agreement for the CDs with the recipients. Accordingly, UMG transferred title to the particular copies of its promotional CDs and cannot maintain an infringement action against Augusto for his subsequent sale of those copies.

**[3]** Our conclusion that the recipients acquired ownership of the CDs is based largely on the nature of UMG's distribution. First, the promotional CDs are dispatched to the recipients without any prior arrangement as to those particular copies. The CDs are not numbered, and no attempt is made to keep track of where particular copies are or what use is

made of them. As explained in greater detail below, although UMG places written restrictions in the labels of the CDs, it has not established that the restrictions on the CDs create a license agreement.[3]

**[4]** We also hold that, because the CDs were unordered merchandise, the recipients were free to dispose of them as they saw fit under the Unordered Merchandise Statute, 39 U.S.C. § 3009, which provides in pertinent part that,

> (a) [e]xcept for . . . free samples clearly and conspicuously marked as such, . . . the mailing of unordered merchandise . . . constitutes an unfair method of competition and an unfair trade practice . . . .
>
> (b) Any merchandise mailed in violation of subsection (a) of this section . . . may be treated as a gift by the recipient, *who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender* . . . .

*Id.* § 3009(a), (b) (emphasis added). The statute defines "unordered merchandise" as "merchandise mailed without the prior expressed request or consent of the recipient" but leaves "merchandise" itself undefined. *Id.* § 3009(d). Although the statute applies in terms to "mailed" merchandise, the Federal Trade Commission has applied its prohibitions to other types of shipment, as violations of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *See* 43 Fed. Reg. 4113 (Jan. 31, 1978)).

---

[3]A few of the CDs are returned, and then destroyed by UMG. Needless to say, they were not the subjects of Augusto's resales. For the CDs that are not returned, UMG does not know the recipients' responses to the distribution or to the conditions UMG attempts to impose.

**[5]** Augusto attempts to invoke this statute directly in his defense, but the statute in terms confers rights only on recipients of unordered merchandise. Augusto does not contend that UMG shipped the promotional CDs to him, nor does he show that any of his sources in fact treated the CDs as gifts.[4] The significance of the Unordered Merchandise Statute is not that it applies to Augusto, but that it confers on the recipients the "right to retain, use, discard, or dispose of [the CDs] in any manner that [they] see[ ] fit, without obligation to the sender," UMG. 39 U.S.C. § 3009(b). This provision is utterly inconsistent with the terms of the license that UMG sought to impose on the recipients. Because the statute grants to the recipients the right to treat the CDs as their own, shipping the unordered CDs to the recipients rendered the recipients owners, not licensees, of the CDs for purposes of the first sale defense. This effect of the Unordered Merchandise Statute distinguishes this case from those involving computer software, where the software consumers clearly ordered and paid for the software licensed to them. *See, e.g., Wall Data*, 447 F.3d at 774.

UMG contends that the Unordered Merchandise Statute clearly does not apply to its distribution of free promotional CDs, because the "main purpose" of the Statute "was to 'control the unconscionable practice of persons who ship unordered merchandise to consumers and then trick or bully them into paying for it.' " *Kipperman v. Acad. Life Ins. Co.*, 554 F.2d 377, 379 (9th Cir. 1977) (quoting 116 Cong. Rec. 22,314 (June 30, 1970) (statement of Sen. Warren Magnuson)). Because UMG is not trying to extract payment from the recipients, it argues that the statute does not apply. But the terms of the statute do not require "bullying" for payment; it is enough that unordered merchandise is sent. The recipient is then free to treat it as a gift "without any obligation whatso-

---

[4]We have recognized a private right of action arising under the Unordered Merchandise Statute, but it is a right of *recipients. Kipperman v. Acad. Life Ins. Co.*, 554 F.2d 377, 380 (9th Cir. 1977).

ever to the sender." 39 U.S.C. § 3009(b). In sending its promotional CDs, UMG attempts to obligate the recipient to confine the use of the CDs to promotional purposes. It serves the purpose of the statute to permit a recipient who does not wish to be so obligated to treat the unordered CD as a gift. We also have no difficulty concluding that the CDs fall within the meaning of "merchandise." UMG's attempt to prohibit their sale is an indication.[5]

There are additional reasons for concluding that UMG's distribution of the CDs did not involve a consensual licensing operation. Some of the statements on the CDs and UMG's purported method of securing agreement to licenses militate against a conclusion that any licenses were created. The sparest promotional statement, "Promotional Use Only—Not for Sale," does not even purport to create a license. But even the more detailed statement is flawed in the manner in which it purports to secure agreement from the recipient. The more detailed statement provides:

> This CD is the property of the record company and is licensed to the intended recipient for personal use only. Acceptance of this CD shall constitute an agreement to comply with the terms of the license. Resale or transfer of possession is not allowed and may be punishable under federal and state laws.

It is one thing to say, as the statement does, that "acceptance" of the CD constitutes an agreement to a license and its restrictions, but it is quite another to maintain that "acceptance" may be assumed when the recipient makes no response at all. This

---

[5]Webster's Third New International Dictionary defines "merchandise" as "commodities or goods that are bought and sold in business: the wares of commerce." *Id.* at 1413. *See also Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) ("'Merchandise' . . . refers to movable articles of value that are bought and sold by merchants."). Augusto's many sales themselves evidence a market, authorized or not.

record reflects no responses. Even when the evidence is viewed in the light most favorable to UMG, it does not show that any recipients agreed to enter into a license agreement with UMG when they received the CDs.[6]

**[6]** Because the record here is devoid of any indication that the recipients agreed to a license, there is no evidence to support a conclusion that licenses were established under the terms of the promotional statement. Accordingly, we conclude that UMG's transfer of possession to the recipients, without meaningful control or even knowledge of the status of the CDs after shipment, accomplished a transfer of title.

The district court based its decision in favor of Augusto in part on somewhat different grounds from those we have adopted. The district court first held that the licensing language in the detailed promotional statement did not create a license because it lacked any provision for UMG to regain possession of the CDs. In this ruling, the district court relied upon our decision in *United States v. Wise*, 550 F.2d 1180

---

[6]Although our result does not depend on the point, there is even doubt that a license contract could arise from the absence of response of the recipients. The general rule of contract law is that the "mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." Restatement (Second) of Contracts § 69 cmts. a, c. "Nothing in contract law [can] force the parties into a contractual arrangement when they do not intend to be bound." Raymond T. Nimmer & Jeff Dodd, Modern Licensing Law § 3:17 (2010).

The commentary on section 69 of the Restatement offers a pertinent illustration: "A sends B a [book] with a letter, saying, 'If you wish to buy this book send me $6.50 within one week after receipt hereof, otherwise notify me and I will forward postage for return.' B examines the book and *without replying* carefully lays it on a shelf to await A's messenger. There is no contract." Restatement (Second) of Contracts § 69 cmt. e, illus. 8 (emphasis added). The Restatement does provide an exception to the rule that silence and inaction do not constitute assent when, "because of prior dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." *Id.* § 69(1)(c). The record as it stands does not suggest that UMG could avail itself of this provision.

(9th Cir. 1977). In *Wise*, we dealt with several contracts, each denominated as a license, by which motion picture studios conveyed films to various recipients.

The issue was whether any of these licenses actually constituted a sale for purposes of the first sale doctrine.[7] We held all but one of the conveyances to be licenses, pointing out that they were designated as licenses, reserved title in the studio, and provided for return or destruction of the prints after use. *See id.* at 1191-92. We held one purported license to be a sale, however, because in addition to the payment of a "cost" price (which did not alone establish a sale), there was no provision for return of the print to the studio; permanent possession was granted to the recipient. *See id.*

Return of possession is not invariably required in a license, however. We have since read *Wise* and our software licensing cases

> to prescribe three considerations that we may use to determine whether a software user is a licensee, rather than an owner of a copy. First, we consider whether the copyright owner specifies that a user is granted a license. Second, we consider whether the copyright owner significantly restricts the user's ability to transfer the software. Finally, we consider whether the copyright owner imposes notable use restrictions.

*Vernor*, 621 F.3d at 1110-11 (footnote omitted).

**[7]** This formulation, however, applies in terms to software users, and software users who order and pay to acquire copies are in a very different position from that held by the recipients

---

[7]*Wise* concerned the first sale doctrine as codified in 17 U.S.C. § 27 (1970), the predecessor to § 109(a). *See Wise*, 550 F.2d at 1183. The two statutes, however, are substantively identical.

of UMG's promotional CDs. As we have already explained, UMG has virtually no control over the unordered CDs it issues because of its means of distribution, and it has no assurance that any recipient has assented or will assent to the creation of any license or accept its limitations. UMG also does not require the ultimate return of the promotional CDs to its possession. Although the failure to require return of the CDs may not, by itself, conclusively establish a sale under our precedent, it is one more indication that UMG had no control over the promotional CDs once it dispatched them. UMG thus did not retain "sufficient incidents of ownership" over the promotional copies "to be sensibly considered the owner of the cop[ies]." *Krause v. Titleserv, Inc.*, 402 F.3d 119, 124 (2d Cir. 2005).

Because we conclude that UMG's method of distribution transferred the ownership of the copies to the recipients, we have no need to parse the remaining provisions in UMG's purported licensing statement; UMG dispatched the CDs in a manner that permitted their receipt and retention by the recipients without the recipients accepting the terms of the promotional statements. UMG's transfer of unlimited possession in the circumstances present here effected a gift or sale within the meaning of the first sale doctrine, as the district court held.

## CONCLUSION

[8] UMG's distribution of the promotional CDs under the circumstances effected a sale (transfer of title) of the CDs to the recipients. Further sale of those copies was therefore permissible without UMG's authorization. The judgment of the district court dismissing UMG's copyright infringement action against Augusto is therefore

**AFFIRMED.**