**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ADOBE SYSTEMS INC.,
 *Plaintiff-Counter-Defendant–Appellant*,

 v.

JOSHUA CHRISTENSON, an individual, DBA www.softwaresurplus.com; SOFTWARE SURPLUS, INC.,
 *Defendants-Counter-Claimants–Appellees*,

 v.

SOFTWARE PUBLISHERS ASSOCIATION, DBA Software Information Industry Association,
 *Third-Party-Defendant*.

No. 12-17371

D.C. No.
2:10-cv-00422-LRH-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
January 29, 2015—University of Arizona, Rogers College
of Law, Tucson, Arizona

Filed December 30, 2015

Before: A. Wallace Tashima, M. Margaret McKeown,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Copyright

Affirming the district court's summary judgment in a copyright infringement case, the panel held that, while the copyright holder bears the ultimate burden of establishing infringement, the party raising a first sale defense bears an initial burden with respect to the defense.

The first sale doctrine provides that, once a copy of a work is lawfully sold or transferred, the new owner has the right to sell or otherwise dispose of that copy without the copyright owner's permission. Adobe Systems, Inc., claimed infringement of its software. The panel held that Adobe established its registered copyrights in the software, and the defendant carried his burden of showing that he lawfully acquired genuine copies. Adobe, however, failed to produce license agreements or other evidence to show that it retained title to the software when the copies were first transferred. The panel held that the district court did not abuse its discretion in excluding evidence purporting to document the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

licenses, and general testimony and generic licensing templates were insufficient to meet Adobe's burden.

The panel held that the nominative fair use defense barred Adobe's trademark infringement claim.

## COUNSEL

J. Andrew Coombs (argued) and Annie S. Wang, Glendale, California, for Plaintiff-Counter-Defendant–Appellant.

Lisa A. Rasmussen (argued), Las Vegas, Nevada, for Defendants-Counter-Claimants–Appellees.

## OPINION

McKEOWN, Circuit Judge:

This appeal, which arises in the context of software licenses, requires us to address the burden of proof applicable to the first sale defense to a copyright infringement claim. Although a copyright holder enjoys broad privileges protecting the exclusive right to distribute a work, the first sale doctrine serves as an important exception to that right. Under this doctrine, once a copy of a work is lawfully sold or transferred, the new owner has the right "to sell or otherwise dispose of" that copy without the copyright owner's permission. 17 U.S.C. § 109(a). Of course, the defense is

contingent on rightful ownership. The old adage "possession is nine-tenths of the law" has no traction under § 109(a).[1]

This appeal stems from a messy copyright dispute between Adobe Systems, Inc. and Joshua Christenson and his software company, Software Surplus, Inc. ("SSI" or "Software Surplus").[2] In the district court, litigation of this case was punctuated by discovery disputes, sanctions, and multiple rulings on the admissibility and exclusion of evidence. The importance of these factors, which the parties emphasize on appeal, is diminished by the central issue—who bears the burden of proving the first sale defense in a software licensing dispute. While the copyright holder bears the ultimate burden of establishing copyright infringement, the party raising a first sale defense bears an initial burden with respect to the defense. At the summary judgment stage, this burden is discharged by producing evidence sufficient for a jury to find that the alleged infringer lawfully acquired ownership of genuine copies of the copyrighted software. Once this initial burden is satisfied, the burden shifts back to the copyright owner to establish the absence of a *first* sale, because of a licensing or other non-ownership-transferring arrangement when the copy first changed hands.

The district court correctly held that Adobe established its registered copyrights in the disputed software and that

---

[1] The origin of the adage, sometimes stated as "possession is nine points of the law," is in some dispute, but it can be traced to Thomas Draxe's 1616 *Bibliotheca Scholastica Instructissima*. *See* Oxford Dictionary of Proverbs 245 (Jennifer Speake ed., 2003).

[2] Software Surplus, Inc. is now defunct, so we use "Christenson" to refer collectively to the defendants–appellees.

Christenson carried his burden of showing that he lawfully acquired genuine copies of Adobe's software, but that Adobe failed to produce the purported license agreements or other evidence to document that it retained title to the software when the copies were first transferred. We affirm the district court's dismissal of both the copyright and trademark claims.

## BACKGROUND

In October 2009, Adobe filed this lawsuit against Christenson. The factual basis for Adobe's claims was simple: on his website, Christenson sold Adobe software—which he purchased from a third-party distributor—without Adobe's authorization, allegedly infringing Adobe's copyrights and trademarks in the process. Christenson asserted numerous defenses, including the first sale defense to the copyright claim. He also filed a counterclaim against Adobe and a third-party complaint against the Software Information Industry Association ("SIIA") for defamation, disparagement, and more, on the basis that SIIA issued a press release about this case stating that Christenson and his company "sold infringing copies, including counterfeit versions" and "swindled" consumers.

The following chronology helps explain why neither party completely closed the loop on proof. The case began as many do: The district court referred the case to a magistrate judge to set discovery and dispositive motions deadlines. A protracted series of discovery exchanges and disputes eventually overlapped with briefing on cross-motions for summary judgment, and the case then departed somewhat from the expected course.

Adobe, with SIIA, moved for partial summary judgment on liability for the copyright and trademark claims and for summary judgment on the counterclaims and third-party claims pertaining to the press release. On the copyright claim, Adobe argued that the first sale defense did not apply because Adobe only licenses and does not sell its software. For support, Adobe relied on a declaration to that effect by its Anti-Piracy Enforcement Manager, Chris Stickle. Stickle generally described different ways that Adobe licenses software, such as by limiting copies to academic users or distributing copies bundled with hardware under restrictive terms, the latter being known as Original Equipment Manufacturer ("OEM") products. Other evidence submitted by Adobe included a list of specific copyrights, a list of Adobe product licenses that had been produced by Christenson, excerpts of Christenson's deposition in which he acknowledged that he sold academic and OEM software, screenshots of the Software Surplus website stating that it sold academic and OEM software, and customer returns and complaints in which customers complained that they had received software licensed for academic use from Christenson despite having understood that they had purchased software appropriate for non-academic users. Regarding the trademark claim, Adobe also argued that Christenson should be liable for false advertising, although as the district court later pointed out, Adobe's complaint did not include this claim.

Christenson, in turn, moved for summary judgment on the copyright and trademark claims. In response to the copyright claim, Christenson argued that only Adobe had access to the terms of its contracts with the original recipients of the copies at issue; Christenson, as a downstream distributor, did not have this information. He thus urged the court to place the burden on Adobe "to disprove the first sale doctrine." With

this burden in mind, Christenson asserted that Adobe could not disprove that a first sale occurred because Adobe was unable to point to the terms of any actual contract. Christenson also offered evidence of his purchase of copies of Adobe software from third parties. Christenson raised a nominative fair use defense to the trademark claim, arguing that he used Adobe's trademark only to refer to Adobe's genuine goods.

The scope of what the court could consider in deciding the cross-motions for summary judgment proved a persistent point of dispute between the parties. After the parties filed their summary judgment motions, Christenson filed a motion to preclude Adobe from relying on contracts, licenses, or agreements that Adobe failed to disclose under Rule 26(a). Fed. R. Civ. P. 26(a). The magistrate judge granted this request and precluded Adobe from using or introducing such documents—except for those that had been produced by Christenson. Christenson then asked the district court to strike any excluded documents and related assertions from Adobe's already ripe motion for summary judgment.

The district court decided the motion to strike and motions for summary judgment in one order. Ruling for Christenson on the copyright claim, the court stated that it was "uncontroverted that Defendants lawfully purchased genuine copies of Adobe software from third-party suppliers before reselling those copies." Reasoning that the burden shifted to Adobe to produce evidence that "it merely licenses and does not sell" the relevant software, the court noted that Adobe would be unable to do so because it was precluded from offering any licenses—the actual terms of which were central to summary judgment.

The court granted Christenson's motion to strike a license template because the document had not been disclosed by Adobe or produced by Christenson. Other evidence was precluded because the court determined that an actual contract was required to prove whether Adobe's transactions resulted in a license as opposed to a sale. "[I]n the absence of those writings," the court foreclosed Adobe's declarants from testifying "to prove the terms and legal effect of Adobe's licensing agreements."

Christenson also prevailed on the trademark claim. The court credited his nominative fair use defense because he used the trademarks to refer to the trademarked goods themselves. The court rejected Adobe's false advertising theory because it was not included in the complaint.

Finally, the court denied Adobe's motion for summary judgment on the counterclaims related to the press release. The court then stayed the surviving counterclaims and entered judgment in Christenson's favor on the copyright and trademark infringement claims pursuant to Federal Rule of Civil Procedure 54(b), resulting in a final, appealable order.

ANALYSIS

## I. COPYRIGHT CLAIM

### A. PRIMA FACIE CASE OF COPYRIGHT INFRINGEMENT

To prevail on a claim of copyright infringement, Adobe must prove ownership of a valid copyright and violation by Christenson, the alleged infringer, of at least one of the exclusive rights conferred by the Copyright Act. *UMG*

*Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1178 (9th Cir. 2011).

Adobe claims that it holds copyrights in a long list of different versions of familiar software titles, such as "Adobe Photoshop CS3 for Windows and Macintosh," "Adobe Photoshop CS3 Extended for Windows and Macintosh," "Adobe Photoshop CS4," and "Adobe Photoshop CS4 Extended." Each new version reflects the result of revisions and additions to the underlying source code of the initial program. As proof of ownership, Adobe submitted the certificates of registration and the registration numbers for each listed title. Christenson does not dispute that the Adobe products he bought and sold are on Adobe's list or that the listed titles are subject to copyright protection. Adobe thus established ownership of valid copyrights of a long list of computer software. *See* 17 U.S.C. § 410(c) ("[T]he certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").

The Copyright Act confers several exclusive rights on copyright owners, including the right of distribution. 17 U.S.C. § 106(3) (granting a right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending"). No factual dispute exists that, through the Software Surplus website, Christenson sold copies of Adobe's copyrighted works without authorization from Adobe. Christenson did not establish any difference between the software titles listed by Adobe, shown in screenshots of the Software Surplus website, and those that he sold. Adobe easily established a prima facie case of copyright infringement.

**B. THE FIRST SALE DEFENSE**

In the face of an otherwise slam dunk copyright violation, Christenson asserts that his conduct fell within an exception to Adobe's distribution rights under § 106—the first sale doctrine. Under the Copyright Act, this affirmative defense provides that "the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . ." 17 U.S.C. § 109(a). The practical effect of this language is to significantly circumscribe a copyright owner's exclusive distribution right "only to the first sale of the copyrighted work" because "once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 141, 152 (1998); *see also Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010) ("[A] copyright owner's exclusive distribution right is exhausted after the owner's first sale of a particular copy of the copyrighted work."). Before answering the question left open in *Augusto* of who bears the burden of proof as to this defense, it is important to understand the contours of the term "sale."[3] *See Augusto*, 628 F.3d at 1178.

---

[3] *Augusto* arose from a dispute over the distribution of compact discs which ultimately ended up on eBay. In addressing an infringement claim against the eBay seller, the court wrote: "While it is an open question as to whether the plaintiff or defendant bears the burden of proving the applicability of the first sale defense . . . we need not reach the issue in this case." *Augusto*, 628 F.3d at 1175, 1178.

In digital copyright cases, the distinction between a "sale" and a "license" has become central. But this distinction did not arise with the advent of computer software. As early as 1908, the Supreme Court recognized that a sale creates a defense to a copyright claim while a license does not. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908).[4] Bobbs-Merrill held the copyright to the novel *The Castaway* and sued Macy & Company for copyright infringement. Each copy of the book had a notice on the title page that the retail price was one dollar and "a sale at a less price will be treated as an infringement of the copyright." *Id.* at 341. Macy purchased copies of the book at a discount and intended to sell them for less than a dollar. The Court held that Bobbs-Merrill did not have a right to control future sales of Macy's copies because a copyright owner "who has sold a copyrighted article, *without restriction*, has parted with all right to control the sale of it." *Id.* at 350 (emphasis added).

Shortly after the *Bobbs-Merrill* decision, Congress codified the first sale doctrine in the Copyright Act of 1909. In this initial statutory iteration, the first sale rule did not explicitly require the defendant to own the copy at issue:

> That the copyright is distinct from the property in the material object copyrighted, and the sale or conveyance, by gift or otherwise, of the material object shall not of

---

[4] Although the Supreme Court initially discussed the first sale doctrine in 1908, the doctrine can be traced to *Pope v. Curll*, an eighteenth-century English case. (1741) 2 Atk. 342. *Pope* centered on a dispute over letters written by Alexander Pope. The decision distinguished between ownership of the paper on which the letters were written and Pope's exclusive right of publication.

> itself constitute a transfer of the copyright, nor shall the assignment of the copyright constitute a transfer of the title to the material object; but nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained.

17 U.S.C. § 41 (1909).

Congress amended the Copyright Act in 1976 and revised the first sale defense. 17 U.S.C. § 109(a). Unlike its predecessor, the amended statute explicitly required that a defendant raising a first sale defense own the copy at issue. *Id.* (limiting the first sale defense to "the *owner* of a particular copy" (emphasis added)). The first sale defense did "not . . . extend to any person who has acquired possession of the copy . . . from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it." *Id.* at § 109(d). The legislative history confirms that Congress intended to "restate[] and confirm[] the principle that, where the copyright owner has transferred *ownership* of a particular copy . . . of a work, the person to whom the copy . . . is transferred is entitled to dispose of it by sale, rental, or any other means." H.R. Rep. No. 94-1476, at 79 (1976) (emphasis added), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5693.

The Supreme Court first analyzed § 109(a) in *Quality King*. Distinguishing between the owner of a copy and a non-owner, such as a licensee, the Court emphasized that "because the protection afforded by § 109(a) is available only to the 'owner' of a lawfully made copy (or someone authorized by the owner), the first sale doctrine would not

provide a defense to . . . any nonowner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful." 523 U.S. at 146–47. In other words, to claim the benefits of the first sale defense, the holder of the copy must actually hold title.

Section 109(a)'s focus on ownership takes on a special significance in the digital context. In a world where licensing agreements are "ubiquitous," "license agreements, rather than sales, have become the predominate form of the transfer of rights to use copyrighted software material." *Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1155 (9th Cir. 2011). In practice, because "the first sale doctrine does not apply to a licensee," *id.*, licensing arrangements enable software companies to restrict initial licensees of software from selling their licensed copies of the software to downstream users.

Broadly construed, the licensing exception in the software context could swallow the statutory first sale defense. We have recognized, however, that some purported software licensing agreements may actually create a sale. *See Vernor*, 621 F.3d at 1111; *Augusto*, 628 F.3d at 1180. To determine whether there is a legitimate license, we examine whether "the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Vernor*, 621 F.3d at 1111. Where these factors aren't satisfied, the upshot is that the copyright holder has sold its software to the user, and the user can assert the first sale defense. *See Augusto*, 628 F.3d at 1180–81.

In the software copyright context, a dispute about the first sale defense raises several questions: First, which party—the copyright holder or the party asserting the defense—bears the

initial burden of showing ownership through lawful acquisition?  Second, what does it take to discharge that burden? And finally, which party bears the burden of proving or disproving a license versus a sale?  General principles of evidence, coupled with the statute and the legislative history, provide the answer.

The burden of proof for an affirmative defense to a civil claim generally falls on the party asserting the defense.  This same principle holds true in copyright.  *See* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.11[F] (2009) ("[A]s a matter of definition, the defendant bears the burden of proof as to all affirmative defenses . . . .").  For example, in claiming the fair use defense to copyright infringement, it is the proponent's burden to come forward with favorable evidence about relevant markets to establish "the effect of the [challenged] use upon the potential market for or value of the copyrighted work."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590–94 & n.20 (1994). Another key example is found in the Digital Millenium Copyright Act, also referred to as the DMCA, 17 U.S.C. § 512.  The DMCA's safe harbor provisions exempt Internet service providers from copyright liability under discrete statutory provisions; proponents who seek the safe harbor bear "the burden of establishing that [they] meet[] the statutory requirements."  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013) (citing *Balvage v. Ryderwood Improvement & Serv. Ass'n, Inc.*, 642 F.3d 765, 776 (9th Cir. 2011)).

The rule is no different for the first sale defense.  Under § 109(a), the party asserting the first sale defense bears the initial burden of satisfying the statutory requirements.  Thus, that party must show ownership through lawful acquisition.

What does this mean in practical terms?  In the context of a summary judgment motion in a software case, it simply means that the party asserting a first sale defense must come forward with evidence sufficient for a jury to find lawful acquisition of title, through purchase or otherwise, to genuine copies of the copyrighted software.  To the extent that the copyright holder claims that the alleged infringer could not acquire title or ownership because the software was never sold, only licensed, the burden shifts back to the copyright holder to establish such a license or the absence of a sale.

This burden-shifting construct makes sense.  The copyright holder is in a superior position to produce documentation of any license and, without the burden shift, the first sale defense would require a proponent to prove a negative, *i.e.*, that the software was not licensed. *See* 3 Nimmer § 12.11(E) ("It is submitted that in a civil action . . . the burden of proving the absence of a first sale should be on the plaintiff . . . . [T]he result . . . appears justified in that it involves 'a matter uniquely within the knowledge of the plaintiff.'" (citing *Bell v. Combined Registry Co.*, 397 F. Supp. 1241 (N.D. Ill. 1975))).

This approach accords with the legislative history and with our general precedent that fairness dictates that a litigant ought not have the burden of proof with respect to facts particularly within the knowledge of the opposing party.  Just as it would be unfair for a copyright holder to be burdened with proving that a downstream holder of a copy did not acquire the copy lawfully, so too it would be unfair to impose the burden of proving the lack of a sale on the proponent of the first sale defense.  As the House Report acknowledges, it is an "established legal principle that the burden of proof should not be placed upon a litigant to establish facts

particularly within the knowledge of his adversary." H.R. Rep. 94-1476, at 81; *see United States v. N.Y., New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n.5 (1957) ("The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary."); 2 McCormick on Evid. § 337 (7th ed.) (2013) ("A doctrine often repeated by the courts is that where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue."). Finally, we note that a downstream possessor, who may be many times removed from any initial claimed license, is hardly in a position to prove either a negative—the absence of a license—or the unknown—the terms of the multiple transfers of the software.

With this framework in mind, we turn to the specifics of this case. As the district court held, it was uncontroverted that Christenson "lawfully purchased genuine copies of Adobe software from third-party suppliers before reselling those copies." Christenson offered invoices to document his purchases of legitimate Adobe software from various suppliers. Nothing on those invoices suggests that he was other than a legitimate purchaser of the software. According to Christenson's sworn statement, "[n]either [he] nor SSI have a contract with any of the suppliers that supplied SSI with software. . . . SSI asked them if they could supply SSI with a product at an acceptable price, and if they could, payment was negotiated." This claim is consistent with Christenson's inability to produce something more than invoices from his suppliers: He cannot produce records that do not exist. Christenson discharged his burden with respect to the first sale defense.

Adobe, of course, argues that Christenson could not have legitimately purchased the software because Adobe always licenses, and does not sell, copies of its software. On this point, the burden shifts back to Adobe to prove the existence and terms of a license. In an ordinary case, Adobe would produce specific license agreements and we would benchmark those agreements against the *Vernor* factors to determine whether there was a legitimate license at the outset, as well as whether downstream customers were "bound by a restrictive license agreement" such that they are "not entitled to the first sale doctrine." *Vernor*, 621 F.3d at 1113.

Asking Adobe to produce the license agreements, which would include any terms or restrictions, is not a difficult burden—Adobe is the original source of the software, claims to control distribution of the software, and holds the copyrights to the software. As Adobe noted in the district court: "Adobe and Adobe alone knows the parties with whom it contracts." That categorical statement says it all—the license/ contract information is uniquely within Adobe's knowledge.

Adobe's problem is that it did not produce those licenses or document the terms of contracts with specific parties. Because of the state of discovery at the time of the summary judgment motions, the district court excluded virtually all of Adobe's late-offered evidence of licenses. Adobe challenges this ruling in its appeal. The district court and magistrate judge had a long history with the parties and their discovery efforts. After a careful examination of the rather tortured discovery process, we conclude that the district court did not abuse its discretion in granting Christenson's motion to strike and excluding evidence purporting to document the licenses. *See Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014)

("Evidentiary rulings are reviewed for abuse of discretion."); *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003) ("We review the district court's ruling on a motion to strike for an abuse of discretion.").

Adobe's effort to substitute general testimony and generic licensing templates in lieu of the actual licensing agreements does not withstand scrutiny under *Vernor*.  Under *Vernor*, the precise terms of any agreement matter as to whether it is an agreement to license or to sell; the title of the agreement is not dispositive.  And here, in the end, there is no admissible evidence that Adobe "significantly restrict[ed] the user's ability to transfer the software" at issue here.  *Vernor*, 621 F.3d at 1111.  We thus affirm the district court's order granting summary judgment in favor of Christenson and against Adobe on the copyright claim.[5]

## II.  TRADEMARK CLAIM

Adobe's primary problem on the trademark claim is that it confuses the claim that it made—trademark infringement—with the claim it wishes it had made—unfair competition, or false advertising.  Although in summary judgment pleadings Adobe belatedly cast its infringement claim as one for false advertising under § 43(a) of the Lanham Act, 60 Stat. 441, as amended, 15 U.S.C. § 1125, the district court rejected the argument because Adobe failed to plead such a false advertising claim in its complaint.  The

---

[5] Adobe also originally argued that the first sale defense does not apply to copies made abroad.  This distinction is no longer relevant because the Supreme Court has since held that the first sale doctrine applies with equal force to goods made and sold abroad.  *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1358 (2013).

district court properly analyzed this claim under the nominative fair use defense to a trademark infringement claim instead of under the unfair competition rubric.

To prove trademark infringement, "a trademark holder must show that the defendant's use of its trademark 'is likely to cause confusion, or to cause mistake, or to deceive.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(a)(1)). The "core element of trademark infringement" is "[p]rotecting against a likelihood of confusion," which helps to "ensur[e] that owners of trademarks can benefit from the goodwill associated with their marks" and "that consumers can distinguish among competing producers." *Id.* (quoting *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002)).

We have long recognized that nominative fair use is a defense to a trademark claim. *See New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306–08 (9th Cir. 1992). The doctrine protects a defendant "where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one." *Id.* at 308. The defense may be invoked "where a defendant uses the mark to refer to the trademarked good itself." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010). This principle recognizes the proposition that "[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the mark owner's consent." *Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d

577, 585 (9th Cir. 2005) (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1510 (9th Cir. 1987)).

In a nominative fair use case, the concern is avoiding confusion over whether the speaker is endorsed or sponsored by the trademark holder. To that end, the *Toyota* test replaces the usual *Sleekcraft* test as the proper measure of consumer confusion when a defendant uses the mark to refer to the trademarked good itself. *Toyota Motor Sales*, 610 F.3d at 1182 (citing *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002)); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). Under the *Toyota* test, we ask "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder." *Toyota Motor Sales*, 610 F.3d at 1175–76 (quoting *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002)).

Rather than argue the *Toyota* factors, Adobe presses the argument that Christenson engaged in a "bait and switch" tactic of selling Adobe products licensed as academic or OEM products by describing them as "full" or "retail" versions, misleading consumers as to which version they would receive. Here lies the confusion: this theory maps to a claim for false advertising or unfair competition under § 43 of the Lanham Act, not trademark infringement under 15 U.S.C. § 1114. Adobe does not argue that the marks did not truthfully label genuine Adobe products as such. Nor does it assert that "Adobe Acrobat Pro" and the same product when under an academic or OEM license, correspond to different marks than Christenson used on the Software Surplus website, to render Christenson's use untruthful. Adobe's major gripe was with the sales themselves, which it

attacked via its copyright claim. The bottom line is that Christenson's nominal use of the marks was to identify the products themselves and not to "inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder." *Toyota Motor Sales*, 610 F.3d at 1176. We therefore affirm as to this claim.

**AFFIRMED**.