**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GLEN E. FRIEDMAN, *Plaintiff-Appellant*, | No. 14-55302 |
| v. | D.C. No. 2:11-cv-02047-MWF-VBK |
| LIVE NATION MERCHANDISE, INC.; ANTHILL TRADING, LLC; ART.COM, INC., *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted February 11, 2016
Pasadena, California

Filed August 18, 2016

Before: Marsha S. Berzon, and John B. Owens, Circuit
Judges, and Algenon L. Marbley,[*] District Judge.

Opinion by Judge Berzon

---

[*] The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

## SUMMARY[**]

### Copyright

In a case arising out of a copyright dispute over Live Nation's unauthorized use, on t-shirts and a calendar, of photographs Glen Friedman took of the hip hop group Run-DMC, the panel (a) reversed the district court's summary judgment in favor of Live Nation Merchandise, Inc., on claims that Live Nation willfully infringed Friedman's copyrights and knowingly removed copyright management information from the images it used, and (b) affirmed the district court's ruling on statutory damages.

Live Nation stipulated that it infringed Friedman's copyrights. The panel held that the evidence in the record gave rise to a triable issue of fact as to whether Live Nation's infringement was willful, which would make it liable for additional damages under 17 U.S.C. § 504(c)(2), and that the district court therefore erred in granting summary judgment to Live Nation on willfulness.

The panel held that the district court also erred in granting summary judgment on Friedman's claim under section 1202(b) of the Digital Millennium Copyright Act regarding removal of copyright management information. The panel explained that Friedman could prevail upon a showing that Live Nation distributed his works with knowledge that copyright management information had been removed, even if Live Nation did not remove it. The panel concluded that

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence in the record creates a triable issue of fact as to whether Live Nation distributed Friedman's photographs with the requisite knowledge.

Affirming the district court's ruling on statutory damages, the panel held that Copyright Act Section 504(c)(1)'s provision of separate statutory damage awards for the infringement of each work "for which any two or more infringers are liable jointly and severally" applies only to parties who have been determined jointly and severally liable in the course of the liability determinations in the case for the infringements adjudicated in the action, and that a plaintiff seeking separate damages awards on the basis of downstream infringement must join the alleged downstream infringers in the action and prove their liability for infringement. The panel concluded that because Friedman did not join any of his alleged downstream infringers as defendants in this case, the district court correctly held that he was limited to one award per work infringed by Live Nation.

## COUNSEL

Lorin E. Brennan (argued), Erica Allen Gonzales, and Douglas A. Linde, The Linde Law Firm, Los Angeles, California, for Plaintiff-Appellant.

Matthew R. Gershman (argued), Peter Yu, Jr., and Jeff E. Scott, Greenberg Traurig LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

BERZON, Circuit Judge:

This case arises out of a copyright dispute over the use of photographs Appellant Glen Friedman took of the hip hop group Run-DMC. Appellee Live Nation Merchandise ("Live Nation") stipulated in the district court that it infringed Friedman's copyrights when it used his photos without his authorization on t-shirts and a calendar. Our questions are whether there is sufficient evidence in the record to permit a jury to conclude that Live Nation committed *willful* copyright infringement, making it liable for additional damages under 17 U.S.C. § 504(c)(2); whether a jury could conclude that Live Nation knowingly removed copyright management information ("CMI") from the photographs in violation of 17 U.S.C. § 1202(b); and whether Friedman can recover statutory damages awards measured by the number of retailers who purchased infringing merchandise from Live Nation, even though Friedman did not join those retailers as defendants in his suit.

## FACTUAL AND PROCEDURAL HISTORY

Glen Friedman is a well-known photographer whose work focuses on figures from several American subcultures, including skateboarders, punk rock musicians, and hip hop artists. His photography has been in gallery exhibitions and on record covers and has been published widely.

During the 1980s, Friedman took a series of photographs of the hip hop group Run-DMC. Several of Friedman's photographs of the group appeared in a book collecting his work. In 2005, Friedman granted a license to Sony Music to

reproduce some of his Run-DMC photographs, accompanied by information indicating that Friedman owned the copyrights, on a website. Fans could download the images to use as computer "wallpapers." Sony's license permitted it to alter the images in some respects — for example, by adding a green tint, a Run-DMC logo, or a sparkle effect — and was the only license in which Friedman authorized such alterations to his photographs.

Live Nation[1] is a music merchandising company involved in the design, manufacture, and sale of apparel and other products featuring images and logos of various popular music artists. In developing products, Live Nation typically enters into written merchandising agreements with music artists in which the artists retain final approval authority on the design, development, distribution and sale of merchandise bearing the artists' marks and likeness. In practice, Live Nation submits "Product Approval Forms" to artists asking them to sign off on the development of products displaying specific images. Those forms supplied by Live Nation include no reference to copyrights or other usage restrictions. Live Nation maintains that artists are "not supposed to" provide approval if they do not have the rights to the proposed photographs, but points to no instruction or agreement so stating.

Live Nation also produced "Style Guides" — essentially, collections of available images of particular artists — to inform suppliers about images they could contract to use on merchandise. Like individual products, the Style Guides

---

[1] In addition to Live Nation, three other parties, Art.com, Inc., NMR Distribution (America) Inc., and Michael Howard, who acted as "distributors, retailers, licensees, and vendors" are named as defendants as to Friedman's copyright claims.

were first submitted to the artists, who were supposed to "pre-clear" the images of them included in the Guides. Live Nation's Run-DMC Style Guide ("Run-DMC Guide") included a number of Friedman's images. Live Nation sought and obtained approval from Run-DMC for a 2008 Wall Calendar that included four of Friedman's images, and later, for three t-shirt designs, that included Friedman images previously featured in the Run-DMC Guide.

After he became aware of Live Nation's use of his photographs, Friedman filed a complaint asserting claims for relief for (1) copyright infringement, under 17 U.S.C. § 101 et seq., and (2) removal of copyright management information ("CMI"), under 17 U.S.C. § 1202. During discovery, Live Nation propounded a set of contention interrogatories and requests for admission. The interrogatories asked Friedman to detail the evidence supporting his claims, while the requests for admission asked him to concede that he lacked evidence to support a number of his assertions. The district court had set April 23 as the discovery cut-off date. Friedman's responses were due on April 19.

Friedman did not respond in time. Instead, on April 20, Friedman filed objections asserting that each request was "untimely" because it "requires a response beyond the discovery cut-off." Friedman claimed that this was so even though his responses were due before the discovery cut-off date as — according to him — the discovery cut-off "is the date by which all discovery, including all hearings on and any related motions, is to be completed." Reasoning that "a hearing on any discovery motion could not be completed before" April 23, and because "discovery not completed before the discovery cut-off date is not enforceable,"

Friedman maintained that he "was not required to provide any response to Defendants' discovery requests."

After the close of discovery, Friedman moved for summary judgment on the copyright infringement issue. In response, Live Nation stipulated to liability for infringement, and the district court entered partial summary judgment in Friedman's favor. Live Nation then moved for partial summary judgment on Friedman's CMI claim, and, to the extent Friedman claimed Live Nation's infringement was "committed willfully" under 17 U.S.C. § 504(c)(2), on the copyright infringement claim. Relying largely on Friedman's discovery default, Live Nation argued that Friedman had produced no evidence whatsoever indicating that Live Nation had willfully infringed his copyrights or had knowingly removed CMI from any of the images. In his opposition to Live Nation's motion, Friedman requested that the court permit him to withdraw any deemed admissions under Federal Rule of Civil Procedure 36(b).

Without referring to deemed admissions or explicitly ruling on Friedman's Rule 36(b) request, the district court granted Live Nation's motion for partial summary judgment. On the CMI claim, the court found that "Friedman has offered *no* evidence suggesting that Live Nation Merchandise actually removed CMI from any of his Run-DMC photographs, much less that it did so knowingly or intentionally." As to Friedman's claim of willful infringement, the court concluded that "the burden of proof here rests on Friedman, and it is not clear that he has offered any evidence that would create an issue of fact for a jury."

Friedman next filed a revised statement of damages claiming, "[i]n light of the Court's Order Granting

Defendant's Motion for Summary Judgment, the maximum statutory damage award" of $3,120,000.   Friedman later explained that this figure was based on records indicating that Live Nation had distributed one of the t-shirts to 27 retailers, the other t-shirt to 44 retailers, and the calendar to 33 retailers for a total of 104 separate statutory damage awards of $30,000 each.  *See* 17 U.S.C. § 504(c)(1).

The district court rejected this calculation, ruling that Friedman was "entitled to only one statutory damages award per infringed work."  Even if Friedman's calculation of 104 "downstream infringers" were correct, the court held, this case "involves photographs in a mass-marketing campaign." Although a prior Ninth Circuit case, *Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284 (9th Cir. 1997), *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998), was "arguably consistent with [Friedman's] position if read broadly enough," the court stated that "there is nothing in [*Columbia Pictures*] that suggests its reasoning should be applied to a mass-marketing campaign such as that at issue in this case."

This appeal followed.

## DISCUSSION

On appeal, Friedman challenges the district court's grant of summary judgment to Live Nation on his willful infringement and CMI violation claims.  He also challenges the district court's order limiting his recovery to one statutory damages award per infringed work.

I.

"Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994)). In determining whether there is sufficient evidence to support a grant of summary judgment, we "review[] the record as a whole." *Vander v. U.S. Dep't of Justice*, 268 F.3d 661, 663 (9th Cir. 2001).

Before proceeding to the merits of the grant of summary judgment, we consider, and reject, a threshold question — Live Nation's contention that it is entitled to summary judgment on the basis of Friedman's discovery default.[2]

---

[2] Friedman does not dispute that his objections to the interrogatories and requests for admission were untimely. Friedman does continue to press his argument, raised initially in those objections, that Live Nation's discovery requests were themselves untimely because they required a response on April 19, 2012, just four days before the discovery cut-off date of April 23. Friedman cites no authority for the proposition that a discovery request with a deadline prior to the discovery cut-off could be nonetheless untimely. In any case, Friedman waived this objection by failing timely to raise it. *See* Fed. R. Civ. P. 33(b)(2); 36(a)(3).

Friedman's failure to specify evidence in response to an interrogatory does not mean that the evidence does not exist in the record. In both his motion for summary judgment and his opposition to Live Nation's motion for partial summary judgment, Friedman pointed to specific evidence in the record upon which he relied.

Second, as to any deemed admission due to his failure timely to respond to the request for admissions, Friedman made a motion for relief under Federal Rule of Civil Procedure 36(b), which provides that a court "may permit withdrawal or amendment [of any deemed admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Live Nation's contention to the contrary notwithstanding, *Conlon v. United States*, 474 F.3d 616, 625 (9th Cir. 2007) does not require that a request for relief under Rule 36(b) be brought in a separate motion. Rather, *Conlon* stresses the discretionary nature of relief under Rule 36(b). Nor does Rule 36(b) mandate that relief from a deemed admission may be granted only upon a showing of good cause. As *Conlon* explained, the two factors listed in the rule *are* mandatory, but a district court "*may* consider other factors, including whether the moving party can show good cause for the delay." *Conlon*, 474 F.3d at 625 (emphasis added).

The district court never explicitly ruled on Friedman's Rule 36(b) motion, but it necessarily granted it. The court never stated that Friedman had been deemed to make any admissions, nor did it rely on any of the requested admissions. Instead, the court considered the summary judgment issue on the merits, discussing specific evidence in

the record and stating, with respect to the request for admissions dispute, only that Friedman had attempted to "sidestep[]" discovery. Given this sequence, the district court necessarily granted, albeit implicitly, Friedman's request to withdraw the deemed admissions. It had authority to do so, to "promote the presentation of the merits of the action" and because the timing of the request was so late in the discovery period that Live Nation could not have been prejudiced in its discovery conduct by the inability to rely on deemed admissions.

### A.  Willful Infringement

Under the Copyright Act, the amount of damages a plaintiff may recover for infringement depends on whether the infringement was "committed willfully."  17 U.S.C. § 504(c)(2).  The copyright owner has the burden of proving willfulness.  *Id.*  "[A] finding of 'willfulness' in this context can be based on either 'intentional' behavior, or merely 'reckless' behavior."  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citations omitted).  "To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."  *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)).

A determination of willfulness requires an assessment of a defendant's state of mind.  "Questions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment."  *F.T.C. v. Network Servs.*

*Depot, Inc.*, 617 F.3d 1127, 1139 (9th Cir. 2010) (quoting *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985)). Indeed, as the district court noted, Live Nation was not able to cite *any* "cases in which a court has granted summary judgment in favor of a defendant on the issue of willfulness."

The district court nonetheless granted summary judgment to Live Nation on the willfulness issue, concluding that Friedman had not "offered any evidence that would create an issue of fact for a jury" regarding Live Nation's awareness of or reckless disregard concerning Friedman's copyright rights. Not so.

On the current record, a jury could reasonably conclude that Live Nation's approval procedures amounted to recklessness or willful blindness with respect to Friedman's intellectual property rights. Live Nation's Product Approval Forms say nothing whatsoever about establishing or reporting on who holds the rights to the images whose use is proposed. The forms only include fields indicating the manufacturer of the proposed product, the artist represented, and the suggested price, along with space for unspecified "comments" by Live Nation and the artist. From the face of the documents, one could conclude that they are directed at design decisions, not the rights to the photographs. Nor do the specific forms signed by Run-DMC indicate in any way that the group was clearing the legal right to use the photographs, on their own behalf or anyone else's.

In a declaration in support of Live Nation's summary judgment motion, one of its employees explained that when artists did not own the rights to photographs, "they were not supposed to, and should not, provide their written approval

. . . to develop merchandise using those photographs." But the employee did not say how or when Run-DMC was apprised of this duty. She asserted only that as an industry practice "it is generally the responsibility of the music artists' personal managers to uncover the relevant facts and ascertain the scope of the music artists' rights." Given an approval process that never explicitly asks about copyrights at all, a jury could reasonably conclude that Live Nation's reliance on the artists who were the subjects of the photographs at issue to clear photographic rights, rather than on the photographers who took them — based only on a purported industry practice never reflected in any document — amounted to recklessness or willful disregard, and thus willfulness.

That inference is particularly strong in this case. Live Nation submitted evidence showing that it knew it needed to take special care with respect to Friedman's images. In response to an unrelated request to use certain photographs of Run-DMC, a Live Nation employee sent an email stressing that "we do not want to use ANY Glenn Freidman [sic] Photos for RUN DMC[.] [H]e owns all the rights to his photos and is really not interested in using them for [m]erchandise and he is really expensive to even get clearance for." This email was sent on March 26, 2009, after the infringing use of Friedman's photographs at issue in this case, but before Friedman brought that infringing use to Live Nation's attention on October 21, 2010. Live Nation argues that this email demonstrates that it took active steps to respect Friedman's rights and avoid knowingly using any of his photos without permission. But a jury could as plausibly understand it to demonstrate that Live Nation knew there was a risk that photos of Run-DMC would be Friedman's photos, but nonetheless went forward with developing the

merchandise without taking steps to ascertain whether it featured Friedman's work.

We therefore conclude that, drawing all inferences in Friedman's favor, the evidence in the record gave rise to a triable issue of fact as to Live Nation's willfulness, and we reverse the district court's grant of summary judgment.

## B.  The CMI Violations

Section 1202(b) of the Digital Millennium Copyright Act prohibits, inter alia, the distribution of works "knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law," and with knowledge that such distribution "will induce, enable, facilitate, or conceal" copyright infringement.[3] 17 U.S.C. § 1202(b).  In granting summary judgment on the CMI claim, the district court again relied on what it described as "Friedman's complete failure to adduce competent evidence in discovery or in opposition to Defendants' Motion" and concluded that "he has made no factual showing that Live Nation Merchandise either removed the CMI in question (the alleged 'act') or did so knowingly (the requisite state of mind)."

We note at the outset that the district court focused on the wrong question.  The statute does prohibit the intentional removal of CMI.  *See* 17 U.S.C. § 1202(b)(1).  But Friedman could also prevail upon a showing that Live Nation

---

[3] As defined by the statute, "copyright management information" refers to various types of "information conveyed in connection with copies . . . of a work," including the name of the work, the name of the author, and the name of the copyright holder, among others.  17 U.S.C. § 1202(c).

distributed his works with the *knowledge* that CMI had been removed, even if Live Nation did not remove it.  *See id.* § 1202(b)(3).  The question, therefore, is whether evidence in the record creates a triable issue of fact as to whether Live Nation distributed Friedman's photographs with the requisite knowledge.  We conclude that in the circumstances of this case, it does.[4]

As we have previously explained, "[a] moving party without the ultimate burden of persuasion at trial" — such as Live Nation in this case — nonetheless "has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted).  The moving party may discharge its initial burden by "show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.*  But, "to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Id.*

Where "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103 (citations omitted).  We may

---

[4] In reaching its contrary conclusion, the district court relied on another case with somewhat analogous facts, quoting it for the proposition that "Plaintiff asks the Court to simply assume that [Defendants] must have cropped the [CMI] and must have possessed the requisite intent." (quoting *William Wade Waller Co. v. Nexstar Broad., Inc.*, No. 4-10-CV-00764 GTE, 2011 WL 2648584, at *5 (E.D. Ark. July 6, 2011) (alterations in the district court's opinion).  This reliance was misplaced, as, again, the statute does not require that Live nation have "cropped" the CMI, intentionally or otherwise.

assume that Live Nation carried its initial burden of production in its motion for partial summary judgment. Contrary to the district court's assertion, however, Friedman did produce evidence supporting his claim.  Most importantly, Friedman produced the images as they appeared on Live Nation's merchandise and the same images as they had appeared on Sony's website and in his book.  In his motion for summary judgment, he compared them, demonstrating that there were striking similarities.

For example, some of the photographs used in Live Nation's calendar included alterations, such as tint effects and added logos, that Friedman had authorized only for the Sony website.  Photos that appeared in the Style Guide appeared to have been scanned from Friedman's book, as they contained captions and other layout features that appeared in that source alone.  The images on Live Nation's products did not include copyright information that had been present on the earlier versions.

"[A] 'striking similarity' between the works may give rise to a permissible inference of copying." *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987).  Here, the fact that the photographs used by Live Nation were exact copies of the images precisely as they appeared on Sony's website and in Friedman's book gives rise to the compelling inference that Live Nation's photographs were directly copied from those sources.  Because the *only* material difference in the Live Nation versions was that the CMI was missing, it was necessarily the case that the CMI had been removed on the copied version.

The only question, then, is whether the evidence as a whole permits a reasonable inference that Live Nation knew

of the removal of the CMI.  As to this question, a reasonable jury could certainly conclude that Live Nation had knowledge that photographs are often copyrighted.  Indeed, Live Nation's 2009 employee email indicates its awareness that Friedman himself often held the copyrights to photographs of Run-DMC.  Furthermore, Live Nation has *never* offered *any* explanation of how it came to possess the images.  It did, however, provide the declaration of one of its officers, who asserted that his "investigation . . . uncovered no evidence that [Live Nation] ever obtained any of Mr. Friedman's claimed photographs of Run-DMC *from any website*." (emphasis added).  A jury could draw an adverse inference from this artfully worded language, which carefully avoids either an outright denial that Live Nation copied the photographs knowing that the CMI had been removed or an explanation as to what the investigation did uncover about the origin of the photographs.

At bottom, Live Nation's argument amounts to a claim that Friedman was required to produce direct evidence of Live Nation's knowledge of the CMI removal.  That is not the law.  This court has long recognized that "circumstantial evidence can be used to prove any fact."  *United States v. Ramirez-Rodriquez*, 552 F.2d 883, 884 (9th Cir. 1977).  We have noted in particular that whether a party had knowledge of a particular circumstance "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 841–42 (1994)).  Indeed, whenever state of mind is at issue, "'direct proof' of one's specific wrongful intent is 'rarely available'" and so recourse to circumstantial evidence is most often necessary.  *United States v. Dearing*,

504 F.3d 897, 901 (9th Cir. 2007) (quoting *United States v. Marabelles*, 724 F.2d 1374, 1379 (9th Cir. 1984)).

Live Nation is wrong, therefore, that the evidence in the record as a whole is not consistent with a reasonable, if not particularly strong, inference that Live Nation knew of the removal of the CMI when it distributed Friedman's photographs. Because Friedman had therefore discharged *his* burden of production at summary judgment, the burden shifted back to Live Nation "to carry its ultimate burden of persuasion" by "persuad[ing] the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102. It might have done so by providing some explanation for how it came to possess Friedman's images — missing their CMI — in the first place, establishing its lack of knowledge and negating the inference drawn from the juxtaposition of the photographs.

We recently employed a similar burden-shifting approach in another copyright case. In *Adobe Systems Inc. v. Christenson*, 809 F.3d 1071, 1079 (9th Cir. 2015), we held that when a party asserts the first sale affirmative defense, its burden at summary judgment requires it only to produce "evidence sufficient for a jury to find lawful acquisition of title, through purchase or otherwise, to genuine copies of the copyrighted software." If the copyright holder asserts that its acquisition could not have been lawful because "the software was never sold, only licensed, the burden shifts back to the copyright holder to establish such a license or the absence of a sale." *Id.* We noted that this rule "accords with . . . our general precedent that fairness dictates that a litigant ought not have the burden of proof with respect to facts particularly within the knowledge of the opposing party." *Id.*

So too here. How Live Nation came to possess Friedman's photographs — and thus whether it had knowledge that the CMI had been removed — is a fact "particularly within" Live Nation's knowledge. It would be unfair to burden Friedman at the summary judgment stage with proving that knowledge with greater specificity than he did. We therefore reverse the district court's decision granting summary judgment to Live Nation on Friedman's CMI claim.

## II. Statutory Damages

The Copyright Act provides that "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally . . . ." 17 U.S.C. § 504(c)(1). The number of awards available under this provision depends not on the number of separate infringements, but rather on (1) the number of individual "works" infringed and (2) the number of separate infringers. *See Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990). The only issue on appeal is the number of infringers.[5]

---

[5] As to the number of works infringed, the district court said that it was "not clear" that it could "decide the issue of the number of works on the current record," but that "[t]he number of infringed works is likely either five (the number of Friedman's photographs that have been infringed) or two (the number of Friedman's copyrighted books that have been infringed)." That ruling is not at issue on appeal.

We may assume for present purposes that, as Friedman claims, Live Nation sold infringing merchandise to 104 separate retailers. Our question is whether, applying *Columbia Pictures*, Friedman is entitled under the statute to 104 separate awards, because the retailers were each jointly and severally liable with Live Nation but not collectively jointly and severally liable for the infringement of any one work.

In *Columbia Pictures*, the defendant owned three television stations — also defendants in the suit — each of which infringed works owned by the plaintiff. We concluded that the plaintiff was entitled to separate awards with regard to each of the three stations, which were "separate infringers." 106 F.3d at 294. Looking to the text of Section 504(c)(1), we explained that "when statutory damages are assessed against one *defendant* or a *group of defendants* held to be jointly and severally liable, each work infringed may form the basis of only one award, regardless of the number of separate infringements of that work." *Id.* (emphasis added). On the other hand, *Columbia Pictures* explained, legislative history indicated that "where separate infringements for which *two or more defendants* are not jointly liable are joined in the same action, separate awards of statutory damages would be appropriate." *Id.* (emphasis added) (quoting H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., at 162). Because the stations were each jointly and severally liable with the defendant but *not* with each other, we concluded, the plaintiff was entitled to three separate awards. *Id.* at 294–95 & 294 n.7.

A prominent treatise provides a hypothetical (much discussed by the parties and the lower court) explaining an analogous situation:

If each *defendant* is liable for only one of the several infringements that are the subject of the lawsuit, then each *defendant* will be liable for a separate set of statutory damages (each with its own minimum). Suppose, for example, a single complaint alleges infringements of the public performance right in a motion picture against A, B, and C, each of whom owns and operates her own motion picture theater, and each of whom, without authority, publicly performed plaintiff's motion picture. If A, B, and C have no relationship with one another, there is no joint or several liability as between them, so that each is liable for at least a minimum $750 statutory damage award. Suppose, further, that D, without authority, distributed plaintiff's motion picture to A, B, and C. Although A, B, and C are not jointly or severally liable each with the other, D will be jointly and severally liable with each of the others. Therefore, three sets of statutory damages may be awarded, as to each of which D will be jointly liable for at least the minimum of $750. However, D's participation will not create a fourth set of statutory damages.

*Nimmer on Copyright* § 14.04[E][2][d] (2016) (emphasis added).

Friedman argues that *Columbia Pictures* governs the situation in this case, as a number of "downstream infringers" — retailers to whom Live Nation distributed infringing merchandise — are each jointly and severally liable for

infringement with Live Nation, but not with each other. As in that case, he contends, he should be entitled to a separate award for each "unit" of infringers jointly and severally liable.

The district court rejected this argument. It surveyed a number of recent district court decisions that "rejected outright both the [*Columbia Pictures*] decision and the Nimmer hypothetical, finding them inapplicable to situations involving large numbers of infringements." (quoting *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 313, 318 (S.D.N.Y. 2011)); *see also Bouchat v. Champion Prods., Inc.*, 327 F. Supp. 2d 537, 553 (D. Md. 2003) ("[Professor Nimmer] did not address, and doubtlessly did not consider, a coordinated mass marketing operation such as [the Defendant's] business."). Like those cases, the district court concluded that, due to the large number of downstream infringers, granting Friedman a separate award for each would "lead to an absurd result." The court acknowledged that *Columbia Pictures* was "binding precedent" but concluded that this case was "distinguishable": whereas *Columbia Pictures* "involved television shows and only [three] downstream infringers . . . , [t]his case involves photographs in a mass-marketing campaign with 104 downstream infringers," and there was "nothing in *Columbia* that suggests its reasoning should be applied to a mass-marketing campaign such as that at issue in this case."

We cannot accept this rationale. *Columbia Pictures* is the law of this circuit, and nothing in the opinion — or in the text of the statute itself — admits of a "mass-marketing" exception. Creating such an exception would mean reading the statute in two different ways depending on how many down-the-line violations there were. And it would require us

to come up with some definition of the number of violations required to invoke the exception, without any apparent basis for doing so.

We do agree, though, that Friedman reads *Columbia Pictures* too broadly, albeit for a different reason.  Our holding in *Columbia Pictures* was explicitly premised on the fact that each of the downstream infringers for whom the plaintiff received a separate damages award was a *defendant* in the case.  Before the question of damages was raised, those parties had already been adjudicated liable for infringement, and jointly and severally liable with another infringer.  That is not true in this case.  Here, Friedman first asserted that there were 104 downstream infringers only after the question of Live Nation's liability for its own infringement had been resolved, not having named any of those downstream infringers as defendants in the case.

*Columbia Pictures*'s emphasis on the status of the downstream infringers as defendants is grounded in the language of the statute.  Section 504(c)(1) provides for "an award of statutory damages for all infringements *involved in the action*, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally . . . ."  17 U.S.C. § 504(c)(1) (emphasis added).  Any downstream infringements cannot be "involved in the action" unless the alleged infringers responsible for those infringements were joined as defendants in the case, and the particular alleged infringements involving them adjudicated.

This interpretation is supported by the legislative history on which *Columbia Pictures* relied, which explains that "where separate infringements for which two or more

*defendants* are not jointly liable are *joined in the same action*, separate awards of statutory damages would be appropriate." H.R. Rep. No. 94-1476, 94th Cong., 2d Sess., at 162 (emphasis added). Congress did not, therefore, intend for courts, in determining the amount of damages, to engage in an entirely separate adjudication as to the liability of a large group of people not parties to the case, with respect to separate infringing acts not involved in the action. To the contrary, the situation Congress contemplated was one like that in *Columbia Pictures*, in which each jointly and severally liable pair of infringers was "joined in the same action" and liable for the same infringements.

As the district court rightly recognized, the broad reading of *Columbia Pictures* Friedman urges leads to extremely unlikely results, with direct infringers becoming liable for astronomical sums in cases with large numbers of downstream infringers unrelated to each other. This risk has become particularly acute in the internet era, where rapid peer-to-peer file sharing has enabled mass piracy of books, films, music, and other copyrighted materials. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 920 (2005).

A district court decision illustrates the problem. In *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 313 (S.D.N.Y. 2011), a record company sued the maker of an online file-sharing program that allowed users to download recordings and thereby make them available for peer-to-peer sharing. The plaintiffs identified "approximately 11,000 sound recordings that they allege[d] have been infringed through the LimeWire system." *Id.* at 315. Relying on *Columbia Pictures* and the Nimmer hypothetical, the plaintiffs argued that they were entitled to recover separate

statutory damage awards for each downstream infringer — i.e., sharer — of each infringed work.  The court rejected this position, noting that under this theory "Defendants' damages could reach into the *trillions*" of dollars.  *Id.* at 317.  Like the *Arista Records* court, we cannot conclude that Congress intended such an exorbitant result, although we reach that conclusion for different reasons than did the *Arista Records* court.

We therefore hold that Section 504(c)(1)'s provision of separate statutory damage awards for the infringement of each work "for which any two or more infringers are liable jointly and severally" applies only to parties who have been determined jointly and severally liable in the course of the liability determinations in the case for the infringements adjudicated in the action.  A plaintiff seeking separate damages awards on the basis of downstream infringement must join the alleged downstream infringers in the action and prove their liability for infringement.  Because Friedman did not join any of his alleged downstream infringers as defendants in this case, the district court correctly held that he was limited to one award per work infringed by Live Nation. We therefore affirm the district court's statutory damages ruling.

## CONCLUSION

Because there was sufficient evidence in the record to allow a reasonable jury to conclude that Live Nation willfully infringed Friedman's copyrights and knowingly removed CMI from the images it used, we reverse the district court's

grant of summary judgment to Live Nation on those issues. We affirm the district court's ruling as to statutory damages.

**AFFIRMED IN PART AND REVERSED IN PART.**